*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 04a0405p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LULABELLE MCCOY; MARVIN DANNAMAN; TILLIE
DANNAMAN; RICHARD PUGH, on behalf of themselves
and a similarly situated class,

                *Plaintiffs-Appellees,*

    *v.*

MERIDIAN AUTOMOTIVE SYSTEMS, INC.; MERIDIAN
AUTOMOTIVE SYSTEMS-COMPOSITES OPERATIONS, INC.,

                *Defendants-Appellants.*

No. 04-1195

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-74613—John Corbett O'Meara, District Judge.

Argued: September 15, 2004

Decided and Filed: November 19, 2004

Before: SUTTON and COOK, Circuit Judges; ALDRICH, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Michael R. Levinson, SEYFARTH SHAW, Chicago, Illinois, for Appellants. Andrew Nickelhoff, SACHS WALDMAN, Detroit, Michigan, for Appellees. **ON BRIEF:** Michael R. Levinson, Ronald J. Kramer, SEYFARTH SHAW, Chicago, Illinois, for Appellants. Andrew Nickelhoff, SACHS WALDMAN, Detroit, Michigan, for Appellees.

_____

## OPINION

_____

    SUTTON, Circuit Judge. Meridian Automotive Systems and Meridian Automotive Systems-Composite Operations (collectively "Meridian") challenge the district court's preliminary injunction restraining Meridian from terminating the medical benefits of retirees of an automotive-parts plant in Centralia, Illinois, as well as the benefits of their spouses (collectively "retirees"). Because no one disputes the potential for serious irreparable harm in the absence of a preliminary injunction and because we agree that the retirees have established a likelihood of success on the merits of their claim, we affirm.

_____

[*]The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

1

I.

Plaintiffs are a class of former employees of the Centralia plant who retired from the plant after August 1, 1994. Three different companies owned the Centralia plant during the relevant periods of this dispute: Rockwell International Corporation until August 1994, Cambridge Industries from August 1994 to May 2000, and Meridian from May 2000 to the present. During this time, several agreements between the plant's owners and the employees' union purported to govern the health benefits for employees and retirees.

**The Supplemental Agreement.** In 1991, Rockwell and the International Union United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) entered into a "Supplemental Agreement" covering insurance benefits from July 19, 1991, to July 19, 1994. JA 77. The Supplemental Agreement stated:

> The Company shall contribute the full premium or subscription charge for Health Care . . . coverages continued in accordance with Article III, Section 5, for: (i) a retired employee (including any eligible dependents) provided such retired employee is eligible for benefits under Article II of the Company's Hourly-Rate Employees Pension Plan.
>
> . . .
>
> The Health Care . . . coverages an employee has under this Article at the time of retirement . . . shall be continued thereafter provided that suitable arrangements for continuation can be made with the Carrier(s).

JA 89, 116. The Supplemental Agreement similarly tied retirees' spouses' medical benefits to pension benefits.

**The Collective Bargaining Agreements.** On behalf of its Centralia chapter, the UAW signed three collective bargaining agreements with the companies, the first with Rockwell from 1992 to 1995, the second with Cambridge from 1995 to 1998, the third with Cambridge from 1998 to 2003. In each principal agreement, a section entitled "Pension Plans, Insurance Programs" stated: "The parties have provided for a Pension Plan and Insurance Programs by Supplemental Agreements signed by the parties simultaneously with the execution of this Agreement, which are attached as The Benefits Proposal." JA 180, 367, 551. Each main agreement came with an "Employee Benefits Proposal." The first Employee Benefits Proposal was contained in a separate and simultaneously signed document, and the second and third Proposals were contained within the principal agreements themselves. The Employee Benefits Proposals were not complete plans in and of themselves but instead listed changes to plans already in existence at the time the new agreements were reached.

**The Craft Letters.** On September 28, 1995, and September 25, 1998, on the eves of the 1995–1998 and 1998–2003 agreements, Cambridge and the UAW came to "Agreement[s] Regarding [Pension Integration and] Updating Benefit Plans." JA 405, 605 (bracketed language in 1995 version only). Referred to by the parties as the "Craft Letters," JA 962, these agreements "provid[ed] direction and guidance to their respective employees and representatives involved in the development, implementation and documentation of employee [pension and] benefit plans." JA 405, 605. Both Craft Letters stated:

> Cambridge will amend (if necessary) and administer the [pension plan,] health care plan and all other employee benefit plans covering UAW-represented employees and retired former employees of Cambridge to reflect . . . (iii) application of Rockwell master and/or ["]supplemental["] agreements as previously agreed between Rockwell and the UAW and/or reflected in past practice of Rockwell with respect to Centralia hourly employees, and (iv) all provisions of Exhibit B to the National Agreement between Rockwell and the UAW, entitled "Supplemental Agreement on Health and Insurance Programs" applicable to

Centralia hourly employees, unless and until the UAW and Cambridge have agreed or hereafter agree to a different program, provision, or practice.

JA 405–06, 605.

**The Summary Plan Descriptions.** The companies distributed two relevant summary plan descriptions (SPDs), one distributed by Rockwell and dated October 1, 1992, the other distributed by Cambridge and dated August 1, 1994. One section of each SPD was entitled "Termination of Coverage, COBRA Continuation, and Conversion Privilege," JA 293, 454, and contained the following pertinent information. The 1992 SPD listed several specific retirement benefits in this section under the heading of "Retirement." JA 294. And under the same heading, the 1994 SPD said: "See the BENEFITS FOR RETIREES section for details on benefits that continue during retirement." JA 455. Under the heading "Miscellaneous Termination of Coverage Provisions," each SPD stated that "[a]ll coverages described in this booklet will automatically end upon discontinuance of the Bargaining Agreement." JA 295, 456.

In a separate section entitled "Benefits for Retirees," each SPD contained a heading addressing "Medical Plan Benefits," which explained that "[Rockwell/Cambridge] will continue to provide medical, prescription drug and hearing aid coverage to all Employees who retire as determined by the Employer, under the normal retirement, early retirement or disability provisions of the Retirement Plan for Hourly Rated Employees of the Centralia, IL Plant Pension Plan." JA 300, 461. Under the heading "Termination of Coverage Provisions," both SPDs said that "[i]f the Group Benefits Plan were discontinued, all coverages would then cancel." JA 300, 462.

In a section entitled "Compliance with the Employee Retirement Income Security Act of 1974," the 1992 SPD stated that "[t]he Group Benefits Plan is in compliance with the Supplemental Agreement Benefits Program between Rockwell International and the International Union, UAW and its Local 1766 for Hourly Employees at Centralia, Illinois." JA 309. In the same section, the 1994 SPD stated that "[t]he Group Benefits Plan is in compliance with the Agreement between Cambridge Industries, Inc. and the International Union, UAW and its Centralia Illinois, Local 1766." JA 472. In a separate heading of this section captioned "Plan Continuance," both SPDs stated:

> The Plan may be amended at any time and in any manner by [Rockwell/Cambridge]. While [Rockwell/Cambridge] intends to continue the plan indefinitely, it reserves the right to terminate all or part of the Plan at any time, and cancel all or part of the coverages and benefits under the Plan. Any such action would be taken only after careful consideration and subject to the provisions of any applicable collective bargaining agreement.

JA 310, 473.

On May 10, 2000, Cambridge sought bankruptcy protection under Chapter 11 and simultaneously sold the plant to Meridian. Meridian assumed Cambridge's duties under the then-existing collective bargaining agreement. Meridian shut down the plant in July 2003, but initially continued to honor the agreement. On September 24, 2003, however, Meridian notified members of the plaintiff class of retirees and spouses that their medical benefits would terminate effective November 30, 2003, some two months after the last collective bargaining agreement's expiration date.

On November 17, 2003, the retirees brought a two-count complaint against Meridian (1) under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking damages and injunctive relief for breaches of the collective bargaining agreements, and (2) under § 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, seeking to recover (and to clarify their eligibility for) benefits due under an employee welfare benefits plan. Apparently without formal discovery, the parties filed briefs on the motion for preliminary injunction. After a hearing on January 9, 2004, the district court granted the retirees' motion for a preliminary injunction on February 6, 2004, and ordered Meridian to continue the benefits. The court concluded that the Supplemental Agreement paralleled the language of the

collective bargaining agreement at issue in *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996), which held that equating eligibility for retiree health benefits with eligibility for a pension established a likelihood of success that the health benefits vested upon retirement, 73 F.3d at 656–57. "[W]hen this factor is combined with the certain irreparable harm that may be suffered by individual retirees during [the] pendency of this litigation," the district court reasoned, "an injunction must issue." D. Ct. Op. at 4.

## II.

Courts consider four factors when deciding whether to issue a preliminary injunction: the claimant's likelihood of success on the merits; the risk of irreparable harm in the absence of an injunction; the possibility of substantial harm to others; and the public interest. *See, e.g.*, *Golden*, 73 F.3d at 653; *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). Meridian contests only the district court's finding that the retirees established a likelihood of success on the merits. A preliminary-injunction decision receives abuse-of-discretion review, which requires reversal only if the district court incorrectly applied the law or relied on clearly erroneous findings of fact. *Golden*, 73 F.3d at 653.

The parties agree that *UAW Local 134 v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), sets the analytical stage for resolving this dispute. Under *Yard-Man*, parties to a collective bargaining agreement may contract for benefits that continue beyond the life of the agreement. *Id.* at 1479. Basic principles of contract interpretation determine whether benefits survive the expiration of an agreement, which among other things means that courts should "look to the explicit language of the collective bargaining agreement for clear manifestations of intent," should view each contract provision "as part of the integrated whole" and should construe terms "so as to render none nugatory and avoid illusory promises." *Id.* at 1479–80. When ambiguities exist regarding these considerations, the court may examine extrinsic evidence of the parties' intent. *Id.* at 1480 n.1; *see also UAW Local 540 v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999). While *Yard-Man* recognized an inference that "status" benefits, including retiree benefits, continue as long as the status is maintained, it also noted that such benefits are not necessarily interminable and no federal labor policy establishes a presumption of vesting. *Id.* at 1482.

Two post-*Yard-Man* cases help to illustrate how these principles have been applied in the context of retiree health benefits. In *Golden*, we enjoined an employer from terminating retiree benefits (1) because the agreement tied retiree medical benefits to vested pension benefits, which suggested that the parties meant to vest health benefits upon retirement as well, and (2) because language in the SPD and the conduct of the employer indicated that the health benefits vested upon retirement. 73 F.3d at 656–57. In *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907 (6th Cir. 2000), we held that the union was precluded from arguing that retirement benefits had vested because it failed to file a grievance when the employer distributed an SPD containing an explicit reservation of rights allowing the employer to terminate coverage. *Id.* at 913, 919.

In applying these cases here, we can dispose of one point quickly. The language of the Supplemental Agreement is virtually identical to the agreement at issue in *Golden*, in which this court held that retirement-health benefits vested upon retirement. 73 F.3d at 656. Because the Supplemental Agreement ties eligibility for retirement-health benefits to eligibility for a pension, in other words, there is little room for debate that the retirees' health benefits vested upon retirement under *Golden*—at least, that is, if we also conclude that the collective bargaining agreements incorporated the Supplemental Agreement. To that difficult question we now turn.

No one could confuse the agreements at issue with models of clear draftsmanship. And while the ambiguities in them permit argument until one is "blue in the face," *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 609 (7th Cir. 1993), the district court correctly concluded—at least at this stage of the litigation—that the collective bargaining agreements incorporated the Supplemental Agreement. As an initial matter, the language of all three primary agreements supports this conclusion. "The parties," all three agreements state, "have provided for a Pension Plan and Insurance Programs by Supplemental Agreements

signed by the parties simultaneously with the execution of this Agreement, which are attached as The Benefits Proposal." JA 180, 367, 551. Each attached Employee Benefits Proposal in turn contains a list of health-benefit adjustments that are incomplete and indeed incoherent without reference to an existing health-coverage plan. Meridian has failed to identify any other document—besides the Supplemental Agreement—that provides the foundational coverage agreement upon which the Employee Benefits Proposal builds. And based on our independent review of this preliminary-injunction record, we have been unable to identify any other agreement that suitably applies.

The Craft Letters—the September 1995 and September 1998 agreements that the district court found to be incorporated into the 1995–1998 and 1998–2003 collective agreements—also support this conclusion. Both letters refer to, and enforce, "supplemental agreements" between Rockwell/Cambridge and the UAW, then refer to "Exhibit B" of an agreement between Rockwell and the UAW "entitled 'Supplemental Agreement on Health and Insurance Programs.'" JA 405–06, 605. The beginning of the 1991–1994 Supplemental Agreement between Rockwell and the UAW reads:

Exhibit B

SUPPLEMENTAL AGREEMENT

(Insurance Program).

JA 80. This "Exhibit B Supplemental Agreement" contains the *Golden* language (tying eligibility for health benefits to pension vesting) and is the primary agreement upon which the retirees premise their claim.

The 1992 and 1994 SPDs further support this conclusion. *See Maurer*, 212 F.3d at 913 (describing SPDs as "in addition" to the collective bargaining agreement, but enforcing SPD provisions after they were sufficiently distributed); *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1186 (E.D. Mich. 1997) (stating that SPDs are "extrinsic evidence" of the terms of a collective bargaining agreement). Each SPD states that "[Rockwell/Cambridge] will continue to provide medical, prescription drug and hearing aid coverage to all Employees who retire as determined by the Employer, under the normal retirement, early retirement or disability provisions of the Retirement Plan for Hourly Rated Employees of the Centralia, IL Plant Pension Plan." JA 300, 461. In addition, the 1992 SPD states: "The Group Benefits Plan is in compliance with the Supplemental Agreement Benefits Program between Rockwell International and the International Union, UAW and its Local 1766 for hourly employees at Centralia, Illinois," JA 309, which appears to incorporate the Supplemental Agreement upon which the retirees rely. True, the corresponding language in the 1994 SPD refers only to the "Agreement" between Cambridge and the union. But that is not inconsistent with the continued incorporation of the Supplemental Agreement. The company distributed the first SPD at the outset of the 1992–1995 principal agreement, which as the district court found incorporated the Supplemental Agreement. By the time the company issued the 1994 SPD, the "Agreement" between the plant owner and employees already included the Supplemental Agreement, apparently giving the company no reason to mention the 1991–1994 agreement by name.

In addition to these documents, other extrinsic evidence supports the district court's ruling. *See, e.g.*, *BVR Liquidating, Inc.*, 190 F.3d at 774 (finding agreement ambiguous and examining extrinsic evidence including affidavits of negotiators). When Wanda Arnold, for example, retired from the plant on a disability pension in September 2003, which was after Meridian had announced the plant's closing, a Meridian personnel official told her she "would have full benefits, except for vision, for life," JA 19. Retiree Marvin Dannaman said that the personnel office told him and his wife that "the one thing that would never be taken away from us was our medical insurance." JA 35. Retiree Lullabelle McCoy declared: "I specifically recall [a personnel official] telling me that my medical insurance was for life, because it was the primary reason that I took the job with Rockwell." JA 45. Three additional retirees made the same assertion regarding the personnel office's characterization of retiree benefits. And Charles Webb, assistant director of UAW's Rockwell Department, declared that "[t]he [1991–1994] Supplemental Agreement was

understood to be incorporated into the 1992–1995 agreement . . . with certain specified modifications." JA 750. "My understanding," he continued, "was that [the Supplemental Agreement] provided for lifetime medical coverage for retirees and their spouses, which could not be taken away in the future by the employer. I believe that negotiators for Rockwell had the same understanding of that agreement." *Id*.

In response to all of this, Meridian argues that *Maurer* and other language in the agreements—namely, language in the SPDs suggesting that Meridian had a right to terminate benefits—control this case. In *Maurer*, the union did not file a grievance against a widely distributed SPD that contained a reservation-of-rights clause allowing the employer to terminate retiree benefits at any time. 212 F.3d at 913. When the employer terminated retiree benefits two years after distributing the SPD, we held that the union was precluded from arguing that the plaintiffs' retirement benefits had vested. *Id*. at 919.

Noting that the retirees' union never objected to the 1992 and 1994 SPDs, Meridian points to the following language in each SPD to show that this case falls under the *Maurer* rule. First, within the "Termination of Coverage" section, each SPD stated: "All coverages described in this booklet will automatically end upon discontinuance of the Bargaining Agreement." JA 295, 456. Second, within the "Benefits for Retirees" section, each SPD stated: "If the Group Benefits Plan were discontinued, all coverages would then cancel." JA 300, 462. Third, within the "Compliance with [ERISA]" section, the SPDs stated:

> The Plan may be amended at any time and in any manner by [Rockwell/Cambridge]. While [Rockwell/Cambridge] intends to continue the plan indefinitely, it reserves the right to terminate all or part of the Plan at any time, and cancel all or part of the coverages and benefits under the Plan. Any such action would be taken only after careful consideration and subject to the provisions of any applicable collective bargaining agreement.

JA 310, 473.

Although Meridian's reliance on *Maurer* and the cited SPD language is not without foundation, this argument has several flaws—at least based on the preliminary-injunction record we have before us. For one, the SPD language on which Meridian relies is not the same unqualified reservation-of-rights language that would fairly prompt a union to protest. In *Maurer*, under the heading "Amendments," the SPD said: "[Employer] reserves the right to amend or terminate any of the plans. The right to amend includes the right to curtail or eliminate coverage for any treatment, procedure, or service regardless of whether you are receiving treatment for an injury, illness, or disease contracted prior to the effective date of the amendment." *Id*. at 913. This language does not limit the scope of coverages affected and most notably permits the employer to terminate coverages upon which employees and retirees had already come to depend and indeed with respect to medical treatments they already were receiving. The language also is unlimited in its explanation for terminating coverage, providing a right to terminate coverages at any time, regardless of any collective bargaining agreement already in place or any future collective bargaining negotiations. Because the language in *Maurer* announced a unilateral right by the employer to terminate coverage without regard to existing or future collective bargaining agreements, that reservation of rights fairly should have prompted the union immediately to protest—and file a grievance—if it disagreed with the employer's assertion of authority.

The SPDs in this case do not provide the same reservation of rights—whether as a matter of specificity or the assertion of a unilateral right. While referring to "all coverages," they do not contain *Maurer*'s explicit and sweeping authority to retract coverage, even coverage already being provided for an existing illness. Instead, they refer to termination only "upon discontinuance of the Collective Bargaining Agreement," "[i]f the Group Benefits Plan were discontinued" or "subject to the provisions of any applicable collective bargaining agreement." Not once do the SPDs establish a termination right without reference to the collective bargaining agreement and the limitations on that right included in the agreement.

Under these circumstances, union leaders—who apparently believed, as we do, that the collective bargaining agreement created vested retirement benefits—were not compelled to protest the SPD language.

To put the point another way, Meridian correctly does not argue that the SPD language would allow termination of current-employee benefits *before* the expiration of the collective bargaining agreement, as that would not be a termination "subject to the provisions of" the agreement. Nor do the retirees (equally correctly) contest the fact that the SPD language would allow Meridian to terminate current-employee benefits *after* the collective bargaining agreement expired (or "upon discontinuance of the Bargaining Agreement" or "[i]f the Group Benefits Plan were discontinued"), as the agreement does not provide current-employee benefits into perpetuity but only during the period of the agreement. Importantly for this case, however, the collective bargaining agreement in one important setting does more than just establish benefits for the agreement period; it also calls for those benefits to vest upon retirement by using the *Golden* pension-vesting language. Because a collective bargaining agreement may provide for benefits that outlast the agreement, the termination of vested retirement health benefits *after* the agreement has expired is no more compliant with—or "subject to the provisions of"—the collective bargaining agreement than terminating them *before* the agreement expired.

Nor does this reading of the agreement extract all meaning from the reservation-of-rights clauses. It simply means that changes in health benefits must be consistent with the collective bargaining agreement. And as to future retirees, it alerts them that the company may discontinue the retirement benefits of employees *who have yet to retire* when the agreement ends.

Meridian next argues that even if the SPDs do not prohibit retirement health benefits from vesting, the retirees failed to establish that the collective bargaining agreements incorporated the 1991–1994 Supplemental Agreement. In Meridian's view, the references in the agreements as well as in the Craft Letters to "supplemental agreement" or "supplemental agreements" do not refer to the same Supplemental Agreement upon which the retirees rely to establish vesting. It is true, as Meridian points out, that the principal agreements only appear directly to incorporate the Employee Benefits Proposal attached to the agreements themselves. But these proposals contain nothing more than amendments to an existing benefits plan. While the retirees have offered several reasons why the 1991–1994 Supplemental Agreement must be *that* existing benefits plan, including the references in the Craft Letters, Meridian has failed to point to any other document that is more likely to represent this independent benefits plan than the Supplemental Agreement.

Meridian next argues that even if the collective bargaining agreements incorporate the Supplemental Agreement, *Golden* does not mandate a finding of likelihood of success on the merits for three reasons. First, pointing to the reservation-of-rights language in the SPDs, Meridian notes that the *Golden* agreement did not contain similar language, then argues that the difference between the two types of agreements shows that the parties here did not intend to have health benefits vest upon retirement. But, as shown above, the limitation on this reservation-of-rights language—namely, that any benefits changes must be consistent with the collective bargaining agreement—suffices to reject this argument.

Second, Meridian argues that the Supplemental Agreement itself made potentially detrimental changes to retirement benefits, which applied to employees who retired *before* August 1, 1991, when the Supplemental Agreement took effect. These detrimental changes, Meridian argues, would not have been possible if the original benefits had vested, suggesting that the parties did not intend retirement benefits—at least those of employees who retired after August 1, 1994—to vest. But in the absence of further information about the pre-1991 collective bargaining agreement and the course of conduct of the parties before 1991, which this preliminary-injunction record does not reveal, it is difficult to know whether the 1991–1994 agreement meant to change or perpetuate the status quo or indeed to know what that status quo was.

Third, Meridian points to the following sentence at the end of an "FAS 106 Letter" (regarding an accounting standard for companies to determine the cost of non-pension benefits in compliance with Generally Accepted Accounting Principles (GAAP)) attached to each of the principal agreements: "If the Centralia plant closes[, is sold] or the [FAS 106/FAS 106 law] is repealed or altered as to make this funding unnecessary the above agreement becomes null and void." JA 185, 373, 559. But the "above agreement" refers only to the remainder of the FAS 106 letter, which amended an extrinsic base benefits plan—again apparently set out in the Supplemental Agreement—to establish spending caps for individual retirees.

In affirming the district court's likelihood-of-success determination, we do not mean to foreclose a different ruling at the permanent-injunction phase of this case. As noted, the relevant agreements leave much to be desired when it comes to clarity. And little if any discovery appears to have been conducted thus far. Under these circumstances and with an eye to minimizing the economic risk of error to Meridian (which in the interim must continue to pay benefits), we urge the district court promptly to hold a permanent-injunction hearing (once discovery has been conducted) and authorize the non-prevailing party to seek review of the permanent-injunction ruling on an expedited basis in this court.

III.

For these reasons, we affirm.