Frank HARGROVE, Jr. and Richard
White, for themselves and others simi-
larly-situated, and International Un-
ion, United Automobile, Aerospace,
and Agricultural Implement Workers
of America (UAW), Plaintiffs,

v.

EAGLEPICHER CORPORATION also
known as EP Management Corpora-
tion and as Eaglepicher Management
Company, Defendant.

Case No. 2:10–cv–10946.

United States District Court,
E.D. Michigan,
Southern Division.

April 4, 2012.

852

Stuart M. Israel, Legghio & Israel, P.C., Royal Oak, MI, for Plaintiffs.

Jeffrey G. Muth, Barnes & Thornburg, Grand Rapids, MI, for Defendant.

## ORDER GRANTING SUMMARY JUDGMENT AND PERMANENT INJUNCTION

ARTHUR J. TARNOW, District Judge.

Pursuant to plaintiffs' motion for summary judgment and permanent injunction (docket 16) and the other papers filed regarding that motion (docket 26, 28, and 31), pursuant to the March 21, 2012 hearing addressing the motion, and the Court having considered the papers, evidence, and viewpoints presented by the parties and being otherwise advised, the motion is granted for the reasons stated on the record at the hearing and as summarized in the findings of fact and conclusions of law below. Judgment shall be entered for plaintiffs, and defendant shall be permanently enjoined as follows.

### A. Background

1. Plaintiffs Frank Hargrove Jr. and Richard White are retirees and former employees of defendant EaglePicher. They worked at EaglePicher's now-closed Wolverine Gasket plant in Inkster, Michigan where they were members of the collective bargaining unit represented by plaintiff International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW). EaglePicher and UAW were parties to various collective bargaining agreements ("CBAs") promising retirement healthcare benefits.

2. Plaintiffs Hargrove and White sue for themselves and for a similarly-situated class of approximately 22 retirees and retirees' family members and surviving spouses. The class sues under Section 301 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 185, and Section

502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a). UAW sues under LMRA Section 301.

3. The class was certified. (Docket 34). It consists of: All former EaglePicher/Wolverine Gasket employees who were members of the UAW-represented collective bargaining unit at EaglePicher's now-closed Wolverine Gasket plant in Inkster, Michigan who are eligible under collective bargaining agreements and welfare benefit plans for company-provided retirement healthcare, and all eligible surviving spouses and other eligible dependents of those retirees.

4. The lawsuit challenges defendant's modification of collectively-bargained retirement healthcare benefits, defendant's imposition on retirees and dependents of added risk and expense, defendant's planned imposition of premium costs on retirees and their family members and surviving spouses, defendant's planned termination of all company-paid retirement healthcare, and defendant's assertion of a right to unilaterally modify and terminate the promised healthcare in the future.

5. EaglePicher promised to provide company-paid lifetime retirement healthcare in the various CBAs governing class members. For example, in Appendix "F" of the August 1, 2002–July 31, 2005 CBA, the last EaglePicher–UAW CBA in effect at the time of the 2003 closing of the Wolverine Gasket plant, EaglePicher promised that "upon retirement" employees with 20 or more years of service as of August 1, 1993 "will receive full medical benefits for life under the guideline of the current retiree medical benefit plan, at no premium cost to the employee." Appendix "F" also is in the 1993–1996, 1996–1999, and 1999–2002 CBAs between EaglePicher and UAW. Earlier CBAs contain similar promises. For example, the 1984–1990 EaglePicher–UAW CBA promises that

EaglePicher "will pay the full cost" of healthcare "for retired employees" and "for the surviving spouse of a retired employee."

6. In addition, EaglePicher is the employer-"sponsor" and "administrator" of the ERISA-regulated, collectively-bargained "employee welfare benefit plan" that it operates to "provide healthcare benefits for UAW-represented retirees, including the individual plaintiffs and others similarly-situated and their spouses and surviving spouses and other eligible family members." (Ans. ¶¶ 8–9, 12–13, 39–41).

7. EaglePicher provided the retirees and other class members with the promised healthcare from the retirees' various retirement dates until January 1, 2010. As EaglePicher correspondence put it in 2009, EaglePicher provided the promised coverage "without any changes to benefits or costs [to retirees] for more than twenty years."

8. EaglePicher wrote to "EaglePicher Retirees with Medical Coverage" in 2009 announcing "changes to the health coverage you have been receiving as an eligible EaglePicher retiree." On January 1, 2010, EaglePicher unilaterally reduced benefits and imposed greater expense and risk on covered persons. For example, until January 2010, covered persons paid $2 per-prescription co-payments. Under the unilaterally-imposed 2010 plan for retirees and family members 65 and over, covered persons were required to co-pay 15%, 25%, or 35% of prescription costs, up to $4,550 annually, and after reaching that annual limit, they still would be required to pay 5% co-payments for prescriptions, without any limit.

9. EaglePicher announced in 2009, too, that it planned "to begin charging for retiree health coverage" beginning on January 1, 2011. EaglePicher announced that this "cost-sharing" would be implemented

in "phases." Retirees and covered family members would be obligated to pay 20% of premium costs in 2011, 40% in 2012, 60% in 2013, 80% in 2014, and "100% of the cost of coverage in 2015 and thereafter." EaglePicher notified retirees in November 2010, however, after this lawsuit was filed, that they "will not be required to contribute towards the premium cost for 2011." Nevertheless, EaglePicher asserted in 2011 that retirement healthcare benefits were "subject to change at any time," that the company had the "unlimited right to make benefit plan changes at any time," and that any changes would be "effective regardless of whether notice has been given" to retirees.

10. Plaintiffs sued on March 9, 2010, challenging defendant's unilateral changes, the added expense and risk imposed by defendant on retirees and dependents, defendant's planned imposition of premium costs on retirees and dependents, defendant's planned termination of all company-paid healthcare, and defendant's assertion of the right to unilaterally modify and terminate retirement healthcare.

11. Plaintiffs asked the Court to grant summary judgment in their favor, to declare defendant in breach of CBA and in violation of ERISA, and to issue its permanent injunction (1) restraining defendant from imposing premium costs; (2) barring defendant from discontinuing full company funding of retirement healthcare; (3) directing defendant to restore the *status quo ante* by promptly reinstating and permanently maintaining the lifetime healthcare benefits that were in effect before the January 1, 2010 and later changes; and (4) directing defendant to promptly make whole class members for expenses incurred due to defendant's CBA and ERISA violations. (Docket 16 and 28). Defendant responded. (Docket 26 and 31). The Court heard the parties on these matters on March 21, 2012. The Court grant-

ed plaintiffs' motion for the reasons stated from the bench at the hearing and as set out in this order.

### B. Conclusions of Law

■ 12. Collectively-bargained retirement healthcare promises are enforceable under LMRA Section 301. See e.g., *UAW v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir.1983), *cert. denied* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) and *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir.2006), *cert. denied* 549 U.S. 1019, 127 S.Ct. 554, 166 L.Ed.2d 410 (2006). Generally, the core issues in retirement healthcare cases are "whether the retirement health care benefits vested for life" and whether they are to be "fully funded" by the employer. *Yolton*, 435 F.3d at 574.

■ 13. Collectively-bargained retirement healthcare promises are also "welfare benefit plans," so that broken CBA promises enforceable under LMRA are also enforceable under ERISA. See e.g., *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir.2009) citing *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir.2000) ("[i]f the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a LMRA violation") and *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir.1991) (broken retirement healthcare promises are CBA breaches and also "a violation of ERISA").

■ 14. In addressing collectively-bargained retirement healthcare promises, the courts apply "traditional rules for contractual interpretation." *Yard–Man*, 716 F.2d at 1479. See *Reese v. CNH America LLC*, 574 F.3d 315, 321, *reh. denied*, 583 F.3d 955 (6th Cir.2009) ("ordinary principles of contract interpretation").

■ 15. The rules for interpretation and application of collectively-bargained

retirement healthcare promises are set out in *Yard–Man*. The "court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." Where "ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance." The court may consider the contractual "context" and "interpret each provision in question as part of the integrated whole" and "consistently with the entire document and the relative positions and purposes of the parties." 716 F.2d at 1479–1480. Accord: *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069–1070 (6th Cir.2008); *Yolton*, 435 F.3d at 579; *McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417, 422 (6th Cir. 2004); and *Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 654–655 (6th Cir.1996).

16. "A court may find vested rights 'under a CBA even if the intent to vest has not been explicitly set out in the agreement.'" *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir.2008), quoting *Maurer*, 212 F.3d at 915. *Maurer* recognizes, too, that: "CBAs may contain implied terms, and the parties' practice, usage, and custom can be considered." *Id.* If CBA analysis does not resolve ambiguities, the court may consider "extrinsic" evidence of the contracting parties' intent. *Yard–Man*, 716 F.2d at 1479–1480.

17. Once vested, promised retirement healthcare benefits may not be unilaterally altered. See *Allied Chemical Workers v. PPG Co.*, 404 U.S. 157, 182 n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) ("[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent"; a retiree has "a federal remedy" under LMRA Section 301 "for breach of contract if his benefits were unilaterally changed"); *Yolton*, 435 F.3d at 578 (citation omitted) (once healthcare benefits are vested, "the employer's unilateral modification or re-duction of those benefits constitutes a LMRA violation"); *Schreiber*, 580 F.3d at 364 (quoting *Yolton*, "If the parties vested health benefits, an 'employer's unilateral modification or reduction of those benefits'" is an LMRA violation); *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1009, n. 5 (6th Cir.2009) ("once benefits vest, an employer's unilateral modification or reduction of benefits constitutes a Section 301 violation" and "an ERISA violation as well"); *UAW v. Loral Corp.*, 107 F.3d 11 (6th Cir.1997) (table), 1997 WL 49077 at *3 (once vested, retiree healthcare benefits cannot be reduced "unilaterally by the employer or the courts"); *Yard–Man*, 716 F.2d at 1482, n. 8 (union and employer "may not . . . bargain away retiree benefits which have already vested").

## C. Findings of Fact

18. Here, CBA language clearly promises that eligible retirees "will receive full medical benefits for life under the guideline of the current retiree medical benefit plan, at no premium cost to the employee, upon retirement." The "current" benefits were those in force when that language was first negotiated in 1993 and continued in force, as 2009 EaglePicher correspondence admits, "without any changes" for "more than twenty years," i.e., until EaglePicher unilaterally implemented its new plan on January 1, 2010.

19. CBA language states the contracting parties' intent that those "current benefits" were not to be "terminated, modified, etc. without union consent." Here, the company had no consent from the union or from the retirees. The company had no contractual authority to modify the retirement healthcare benefits, or to assert the unilateral right to modify or terminate those benefits, or to threaten termination of those benefits.

20. In short, the CBAs promise the retirement healthcare benefits that were in effect for the more than 20 years preceding EaglePicher's imposition of modified benefits in 2010 and since. EaglePicher's unilateral modification of those benefits, and planned and threatened future modification and termination of those benefits, were CBA breaches and violations of ERISA.

21. Further, the parties' intent—to provide the retirement healthcare benefits "for life" at "no premium cost" to retirees and dependents, without modification or termination, vested "at retirement"—is confirmed by the undisputed declarations of four retirees.

22. The retirees describe bargaining history, recount the statements of company personnel officials and negotiators, and confirm that the company promised to continue the current coverage for the lifetime of each retiree and family member, and confirm that the company continued that coverage for over 20 years, from the retirees' various retirement dates, until Eagle-Picher's 2010 unilateral changes. These declarations contain Fed.R.Evid. 801(d)(2) company admissions and "extrinsic" evidence, proving plaintiffs' case.

23. For example, retiree Ralph Kaminski describes how during 1993 negotiations, Dennis Weber, then president of EaglePicher's Wolverine Gasket Division, said that he had approval from EaglePicher to promise "lifetime company-paid retirement healthcare for employees who had 20 years or more of plant service as of the start date of the" 1993 CBA, at the "then-current level" of coverage, which "provided 100% payment for most covered services and included $2.00 per-prescription drug co-payments." Kaminski confirms that this promise was set out in Appendix "F" of the 1993–1996 CBA and later CBAs. Retiree Theda F. Perkins describes how during her 1998 pre-retire-

ment meeting, the company personnel manager told her she "would have Eagle-Picher-paid health benefits for my lifetime with $2 prescription co-payments." Perkins recounts that "EaglePicher provided the healthcare benefits ·with the $2 prescription co-payments" from her 1998 retirement until EaglePicher's unilateral 2010 changes challenged in this lawsuit.

24. The declarations and other evidence of EaglePicher's "words and deeds" over time confirm what is clear in the CBAs, that EaglePicher promised to continue the "then-current" retirement healthcare benefits, and broke that promise in 2010. See, e.g., *Golden v. Kelsey–Hayes*, 954 F.Supp. 1173, 1188 (E.D.Mich.1997) (collectively-bargained lifetime retirement healthcare is confirmed by employer's "course of conduct"); *Cole v. ArvinMeritor, Inc.*, 516 F.Supp.2d 850, 861–864, 871–872, 874 (E.D.Mich.2005), *aff'd* 549 F.3d 1064 (6th Cir.2008) (for decades—"until recently"—the company "provided fully-paid retiree health coverage," confirming the collectively-bargained promises; company "admissions and extrinsic evidence" of the company's "intent to provide lifetime retiree health benefits"—what plaintiffs refer to as the company's "words and deeds"— are reflected "in the testimony and declarations of retirees, spouses, and former union representatives who, in a variety of settings," including negotiations and exit interviews, were "assured by company officials" that they were entitled to lifetime retirement healthcare).

25. EaglePicher's arguments are insufficient to rebut the plain contract language and the undisputed and unequivocal evidence of the company admissions and course of conduct over two decades. This evidence forecloses EaglePicher's mistaken reliance on a supposed "reasonableness" standard derived from *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir.),

*reh'd denied* 583 F.3d 955 (6th Cir.2009), on remand, 2011 WL 824585 (E.D. Mich. 3/3/11). *Reese* follows *Yard–Man*, applying the "ordinary principles of contract interpretation," 574 F.3d at 321, and, as noted, *Yard–Man* and its progeny hold that once retirement healthcare benefits are vested, "the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation" and "an ERISA violation as well." See paragraph 17. Moreover, as noted there is CBA language explicitly stating the parties' intent that the promised healthcare benefits, "current" over the more than 20 years preceding EaglePicher's 2010 and later changes, were not to be "terminated [or] modified etc. without union consent."

26. In sum, on the undisputed material facts, plaintiffs have proven their case as a matter of law. They are entitled to summary judgment under Rule 56. In addition, they are entitled to a permanent injunction, for the reasons stated above.

### D. Conclusion

27. Defendant shall comply with its CBA obligations regarding retirement healthcare. Defendant shall promptly restore the *status quo ante* and provide class members with the healthcare benefits in force for the more than 20 years preceding January 1, 2010, and shall continue to provide these healthcare benefits, at no premium cost to class members, for the lifetime of each class member. Defendant shall promptly take such action as necessary to identify, and make whole class members for, the expenses incurred by class members due to the defendant's unilateral changes imposed on the class members during the period from January 1, 2010 until the date that the *status quo ante* is restored.

28. A judgment and permanent injunction implementing this opinion shall issue. The Court shall administratively close this action, but shall retain jurisdiction over any post judgment matters and issues of implementation and enforcement of this order, the judgment, and the permanent injunction.