**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANCES ALDAY; JANICE ALESHIRE;
MARK AGRAVES; FRANK ARMENTA;
MILORAD ARNOKOVICH; LEONARD
BECWAR; JOAN BERNAL; IRMA
BRAVO; JANE BRAVO; THURMAN
BROOKS; HOWARD BROWNSTEIN;
MARLENE BURGER; JAMES BYRNES,
SR.; DAVID CARLESS; JOE
CARRASCO; LIPA CARRASCO;
ROSEMARY CESARE; ERNIE CORRAL;
RACHEL DELACRUZ; JOAN
DONNELLY; PATRICK ECCLES; LUCY
ESPARZA; REBECCA FEDERICO; JERRY
FITCH; DICKIE FLORES; ALICE
GALLARDO; PATRICIA GARCIA;
SANDRA GARY; RICHARD GEHRKE,
SR.; DONALD GENUNG; RONALD
GEUDER; KATHLEEN GLASER;
GEORGE GONZALES; JEANETTE GRAY;
JOSE GUTIERREZ; JEANNE HARRIS;
ROBERT HARRIS; GLORIA
HERNANDEZ; ELOISE HERRAN;
GERALD HOTCHKISS; SHARON
HUDSON; JOHN JACKSON; JOE
KEIFLIN; LARRY KIDNEY; CLARE
L'ARMEE; DAVID LILLIE;

Leslie Llamas; Eric Martinez; Jimmie Martinez; Maria Martinez; Mary McKenna; Patricia McPheron; Josephine Meadows; Roy Mesa; Bill Meyer; Thomas Miller; Michael Mincheff; Carmen Miranda; Larry Mitchell; Henry Modrzejewski; Lois Moore; Heide Moran; Grace Moreno; Abdo Morgan; Carlos Ochoa; Felicita Ortega; Juan Ortiz; Richard Payne; Larry Pollock; Clifton Price; Jack Quattlebaum; Ignacio Rea; Jack Robinson; Bruce Rogers; Jennie Saenz; Robert Sager; Esperanza Saltzberry; Russell Scira; Jeannie Sides; David Sims; Jerold Small; James Smith, Jr.; Julia Soltero; Michael Sommer; Gina Soto; Donald Spross; Ronald Stallings; Donald Strauss; James Sullivan; Mary Terpening; John Terry; Donald Ulliman; Martha Villa; Steve Vuich; Lawrence Wickersham; Mary Williams; George Zukowski,

　　　　　*Plaintiffs-Appellees,*

v.

RAYTHEON COMPANY, a Delaware
corporation,
                *Defendant-Appellant.*

No. 08-16984

D.C. No.
4:06-cv-00032-DCB

MARK AGRAVES; RONALD GEUDER;
CLARE L'ARMEE; DAVID LILLIE,
                *Plaintiffs-Appellants,*

and

FRANCES ALDAY; JANICE ALESHIRE;
FRANK ARMENTA; MILORAD
ARNOKOVICH; LEONARD BECWAR;
JOAN BERNAL; IRMA BRAVO; JANE
BRAVO; THURMAN BROOKS;
HOWARD BROWNSTEIN; MARLENE
BURGER; JAMES BYRNES, SR.; DAVID
CARLESS; JOE CARRASCO; LIPA
CARRASCO; ROSEMARY CESARE;
ERNIE CORRAL; RACHEL DELACRUZ;
JOAN DONNELLY; PATRICK ECCLES;
LUCY ESPARZA; REBECCA FEDERICO;
JERRY FITCH; DICKIE FLORES; ALICE
GALLARDO; PATRICIA GARCIA;
SANDRA GARY; RICHARD GEHRKE,
SR.; DONALD GENUNG; KATHLEEN
GLASER; GEORGE GONZALES;
JEANETTE GRAY; JOSE GUTIERREZ;

Jeanne Harris; Robert Harris;
Gloria Hernandez; Eloise
Herran; Gerald Hotchkiss;
Sharon Hudson; John Jackson;
Joe Keiflin; Larry Kidney; Leslie
Llamas; Eric Martinez; Jimmie
Martinez; Maria Martinez; Mary
McKenna; Patricia McPheron;
Josephine Meadows; Roy Mesa;
Bill Meyer; Thomas Miller;
Michael Mincheff; Carmen
Miranda; Larry Mitchell; Henry
Modrzejewski; Lois Moore; Heide
Moran; Grace Moreno; Abdo
Morgan; Carlos Ochoa; Felicita
Ortega; Juan Ortiz; Richard
Payne; Larry Pollock; Clifton
Price; Jack Quattlebaum; Ignacio
Rea; Jack Robinson; Bruce
Rogers; Jennie Saenz; Robert
Sager; Esperanza Saltzberry;
Russell Scira; Jeannie Sides;
David Sims; Jerold Small; James
Smith, Jr.; Julia Soltero;
Michael Sommer; Gina Soto;
Donald Spross; Ronald
Stallings; Donald Strauss; James
Sullivan; Mary Terpening; John
Terry; Donald Ulliman; Martha
Villa; Steve Vuich; Lawrence
Wickersham; Mary Williams;
George Zukowski,
                              *Plaintiffs,*

v.

RAYTHEON COMPANY, a Delaware
corporation,
            *Defendant-Appellee.*

No. 08-16985

D.C. No.
4:06-cv-00032-DCB

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
May 9, 2011—San Francisco, California

Filed May 21, 2012
Amended August 27, 2012

Before: M. Margaret McKeown, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

Robert Gregory, Mesa, Arizona, for the plaintiffs/appellees/appellants.

Christopher Landau, Washington, DC, for the defendant/appellant/appellee.

## ORDER

The Slip Opinion filed on May 21, 2012, is amended as follows:

[Slip Opinion at page 5547:]

After the words "violates both LMRA § 301 and ERISA. *See id.*" in the last full paragraph on page 5547, add a footnote that reads:

> Such a breach gives rise to a cause of action under not just the LMRA, but also ERISA, for the reasons first laid out in *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991). With regard to the retirees' ERISA claim in that case, the Sixth Circuit reasoned: "The medical insurance plan agreed to in the CBA is a welfare benefits plan under ERISA. The terms of the benefits plan are established in the CBA. Having concluded that Vernitron had no right to terminate plaintiffs' insurance benefits under the CBA, we must also conclude that it had no right to terminate them when we consider the terms of the CBA as a benefits plan under ERISA." *Id.* at 1298. Welfare plans must " 'provide a policy and a method for funding the plan' " and " 'specify a basis for payments to and from the plan.' " *Cinelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1441 (9th Cir. 1995) (citation omitted). An ERISA plan fulfilling these requirements need not be in any particular form, nor need it be in an official plan document. *See Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 938-39 (9th Cir. 2003); *Scott v. Gulf Oil Corp.*, 754 F.2d

1499, 1503 (9th Cir. 1985), *abrogated on other grounds by Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987); *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982) (en banc). The terms of a CBA can therefore establish the terms of an ERISA plan and give rise, if violated, to an ERISA cause of action.

With this amendment, the panel has voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

No future petitions for rehearing or rehearing en banc will be entertained.

---

## OPINION

BERZON, Circuit Judge:

Employees at a defense plant in Arizona collectively bargained for the right to receive employer-provided healthcare coverage after they retired. We consider whether those employees—now retirees—are contractually entitled to receive premium-free healthcare coverage until age 65, or whether the contracts on which the retirees rely as providing that entitlement allowed their prior employer to start charging them for their insurance. Our analysis depends on the language of the relevant documents, considered against the background of employee benefits law and labor law precepts.

# I

The plaintiffs here are a class of retirees who had worked at a defense plant in Tucson, Arizona, as well as their eligible spouses and dependents.[1] The plant was owned by Hughes Missile Systems Group until 1997, at which point it was taken over by the Raytheon Company. Hughes and then Raytheon entered into a series of collective bargaining agreements ("CBAs") with the International Association of Machinists and Aerospace Workers, AFL-CIO and its Local Old Pueblo Lodge, No. 933 ("the union"). From 1972 to 1999, the CBAs entered into consistently stipulated that the "Employer" would provide health insurance for eligible employees who retired under the retirement plan's so-called "contributory option." To participate in the retirement plan's contributory option, employees had to contribute three percent of their eligible compensation.

Before the 2003-2006 CBA became operative on November 2, 2003, Raytheon provided fully funded healthcare coverage for eligible retirees who had participated in the contributory option of their respective retirement plans. The 2003 CBA, however, expressly limited Raytheon's contributions towards future eligible retirees' healthcare coverage. In 2004, Raytheon applied this policy to all employees who had retired while previous CBAs were in place, by starting to charge such retirees monthly premiums for their health insurance.

Several retirees sued on behalf of themselves and a class of other retirees, alleging claims under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and § 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. The district court certi-

---

[1]The spouses' and dependents' rights under the contracts are derivative of the retirees'. For the sake of brevity, we refer most often only to the claims of the retirees themselves.

fied a class of retirees, together with their eligible spouses and dependents, ("Retirees") who had retired under the 1990, 1993, 1996, and 1999 CBAs, and otherwise satisfied the CBAs' eligibility criteria for employer-provided retiree health insurance. The court subsequently granted Retirees' motion for summary judgment on the LMRA and ERISA claims, holding that the CBAs' terms unambiguously establish eligible retirees' contractual right to premium-free health insurance until they reach age 65. Raytheon appeals the order granting summary judgment.

In a separate order, the district court granted Raytheon's motion for judgment on the pleadings regarding Retirees' claims for extracontractual and punitive damages, holding that Retirees are not entitled to such damages. Retirees cross-appeal that order.

## II

Because the parties' positions depend on their differing interpretations of the relevant CBA and ERISA plan provisions, we begin by surveying these provisions in detail. Generally, "[a] retired worker's labor rights are governed by the CBA under which she retired and the terms of any ERISA plans incorporated therein." *Coffin v. Bowater Inc.*, 501 F.3d 80, 97 n.15 (1st Cir. 2007). We therefore look to the contractual documents in effect when Retirees left the active workforce.

As noted, the class includes retirees who retired under four different CBAs—those entered into in 1990, 1993, 1996, and 1999.[2] While the last three CBAs were in effect, Raytheon issued the 1994, 1997, 1999, and 2003 ERISA welfare benefits plans ("the Plans"). Both the CBAs and the Plans changed

---

[2]Hughes executed the 1990-1996 CBAs. Raytheon merged with Hughes in 1997, and was substituted as the employer in the 1996 CBA. Raytheon executed the 1999 CBA.

over time in pertinent ways. We therefore consider both classes of documents in some detail.

*The CBAs*

Each CBA carried a three- or four-year effective term. According to all the CBAs' Current and Supplemental Agreements provision, Article XIX § F, each CBA constituted the sole agreement between the parties during its effective term. Article XIX § F further states that the CBAs' terms and conditions cannot be altered or rescinded except as executed in writing between the parties.

The CBAs' Group Benefits Article (Article XIII of the 1990 and 1993 CBAs; Article XII of the 1996 and 1999 CBAs) covers the group benefits provided to both active employees and retirees. In each instance, § J(1) of the Group Benefits Article obligates the Employer to pay the Comprehensive Medical Plan premiums of active employees, subject to the provisions of § A. Section A(5), in turn, establishes a detailed schedule for determining an active employee's mandatory individual contribution (if any), based primarily on the employee's selected medical plan and "coverage level." Coverage levels include: Employee Only; Employee and Spouse; Employee and Children; and Family.

Section D of the Group Benefits Article encompasses the medical coverage provisions pertaining specifically to retirees. It establishes a distinct dichotomy, for medical coverage purposes, between participants in the retirement plan's contributory and non-contributory options. With respect to contributory-option participants, § D(1) stipulates that the Employer will continue to provide the Comprehensive Medical Plan coverages for which the retiree was covered as an active employee, until the retired employee attains age 65.[3] To

---

[3]The 1999 CBA substitutes the Raytheon Medical Plan for the Comprehensive Medical Plan. We do not refer to the Raytheon Medical Plan separately, but instead include it in our references to the Comprehensive Medical Plan.

qualify for this entitlement, retirees must be between the ages of 55 and 65, have at least five years of continuous employment, and have at least three years of continuous participation in the company retirement plan's contributory option immediately preceding retirement. Section D(5)(e) of the 1993, 1996, and 1999 CBAs further specifies that qualifying retirees pay "no weekly premium/charge" for their medical plans.[4]

The CBAs treat quite differently retirees who participated in the retirement plan's non-contributory option. Section D(5) of the 1990 CBA states that employees who retire with participation in the non-contributory option do not receive employer-provided medical coverage. Section D(6) of the 1993 and 1996 CBAs, and § D(7) of the 1999 CBA, elaborate that a non-contributory option participant may "extend enrollment" in the medical coverages he or she enjoyed as an active employee, but further specify that enrollment is contingent on the retiree's payment of COBRA medical plan premiums.[5]

*The Plans*

The CBAs' Group Benefits Articles frequently reference Raytheon's ERISA welfare benefits plans ("the Plans"). Sections A(2) and D(2) stipulate that the "benefits" of both active and retired employees will be administered in accordance with the Employer's Plan documents. Section J(4) further provides that nothing in the CBAs shall "change any provisions of the Group Benefit Plans provided under this Article XIII [Article XII in the 1996 and 1999 CBAs] as currently in effect, other than those changes specifically referred to here-

---

[4]As we explain below, the 1990 CBA also assured eligible retirees of no-cost retiree health insurance.

[5]The Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 *et seq.* ("COBRA"), "requires group health care plan sponsors to provide continuation coverage for employees who are terminated from their employment under certain specified circumstances, including layoffs." *Local 217, Hotel & Rest. Emp. Union v. MHM, Inc.*, 976 F.2d 805, 806-07 (2d Cir. 1992).

in." Finally, § J(5) expressly subordinates "[a]ll benefits of employees, retired employees, laid off employees and insured dependents" to the "terms of the applicable Plan documents under which payment is claimed." Section 2.5 of the 1999 and 2003 Plans defines "[b]enefits" as "any payments or services made under the Plan to a Participant or other person eligible to receive payments or services pursuant to any Benefit Program"; the term "benefits" is not defined in the excerpts of the earlier Plans included in the record.

The Plans in the record begin with the 1994 Plan; no Plan in the record covers the 1990-94 period, and the parties point to no relevant language in any Plan covering that period. The Plans for 1994 and thereafter contain various reservation-of-rights provisions, on which Raytheon now relies in claiming the unilateral authority to eliminate any premium-payment obligations otherwise established by the CBAs.

Specifically, Section III of the 1994 Plan and § VIII(Q) of the 1997 Plan state that the Employer "reserves the right to alter, amend, modify, revoke or terminate in whole or in part the Plan, except as provided in any agreement with a Collective Bargaining Agent." The 1999 and 2003 Plans contain a reservation-of-rights provision, § 8.1, which similarly authorizes Raytheon to amend the Plan, but without any explicit reference to CBAs.

In addition, the 1999 and 2003 Plans contain two provisions that might affect the Employer's unilateral authority to amend its healthcare coverage obligations to retirees. First, § 9.2 of the 1999 and 2003 Plans ("the no-vesting clause") affirmatively prevents the vesting of any right to, or interest in, benefits provided under the Plans, except as specifically provided under a Benefit Program.[6] Second, § 5.2 of the 1999

---

[6]Section 2.3 of the 1999 and 2003 Plans defines "Benefit Program(s)" as "the benefit plans maintained by the Company listed on Appendix A to the Plan, as such programs and such Appendix A may be amended from

and 2003 Plans ("the contributions clause") gives the Company sole discretion to change the contributions required of Plan participants.

Raytheon argues that these Plan provisions authorize it unilaterally to limit or discontinue Retirees' contractual right to premium-free health insurance. Retirees respond that their contractual rights under the CBAs cannot be extinguished or otherwise modified by provisions in Raytheon's unilaterally adopted Plans. For the reasons set forth below, we hold that, under the terms of the particular agreements here relevant, Raytheon lacked the authority to abrogate unilaterally its collectively bargained premium-payment obligations.

**III**

"Section 301 of the LMRA, 29 U.S.C. § 185(a), creates a federal cause of action for breach of collective bargaining agreements." *Miller v. AT&T Network Sys.*, 850 F.2d 543, 545 (9th Cir. 1988). ERISA provides a cause of action to benefits plan participants or beneficiaries for recovery of benefits due under a plan, to enforce rights under the plan, or to clarify their rights to future benefits under the plan's terms. 29 U.S.C. § 1132(a)(1)(B).

Under ERISA, post-retirement medical benefits are classified as welfare benefits. 29 U.S.C. § 1002(1). Welfare benefits, unlike pension benefits, "do not vest unless and until the employer says they do." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160 (9th Cir. 2001). An employer

time to time." Appendix A, in turn, identifies the benefit packages available to Plan participants. Appendix A to the 2003 Plan, for example, states that the Employee Medical Benefits, Employee Dental Benefits, Employee Vision Care Benefits, Retiree Medical Benefits, Retiree Dental Benefits, Flexible Spending Account Plan, and Employee Assistance Programs shall be "incorporated into and made a part of the Plan," effective "as of January 1, 1999."

is therefore "generally free under ERISA, for any reason at any time, to adopt, modify, or terminate" welfare benefits unless "[it] contractually cedes its freedom." *Inter-Modal Rail Emps. Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 515 (1997) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)) (internal quotation marks omitted).

[1] The terms of medical coverage agreed to in a CBA constitute such a contractual commitment. *See, e.g.*, *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1009 n.5 (6th Cir. 2009). When such a contractual commitment is in place, an employer's breach of its contractual duty to provide benefits violates both LMRA § 301 and ERISA. *See id.* [7] Our question, then, is whether the CBAs under which Retirees worked when employed obligated Raytheon to continue paying their health insurance premiums until they attain age 65; if the CBAs impose such an obligation, Raytheon may be held liable under both the LMRA and ERISA.

---

[7]Such a breach gives rise to a cause of action under not just the LMRA, but also ERISA, for the reasons first laid out in *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991). With regard to the retirees' ERISA claim in that case, the Sixth Circuit reasoned: "The medical insurance plan agreed to in the CBA is a welfare benefits plan under ERISA. The terms of the benefits plan are established in the CBA. Having concluded that Vernitron had no right to terminate plaintiffs' insurance benefits under the CBA, we must also conclude that it had no right to terminate them when we consider the terms of the CBA as a benefits plan under ERISA." *Id.* at 1298. Welfare plans must " 'provide a policy and a method for funding the plan' " and " 'specify a basis for payments to and from the plan.' " *Cinelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1441 (9th Cir. 1995) (citation omitted). An ERISA plan fulfilling these requirements need not be in any particular form, nor need it be in an official plan document. *See Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 938-39 (9th Cir. 2003); *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir. 1985), *abrogated on other grounds by Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987); *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982) (en banc). The terms of a CBA can therefore establish the terms of an ERISA plan and give rise, if violated, to an ERISA cause of action.

In construing a CBA, we apply federal common law principles of contract interpretation, which take into account the policies underlying our national labor laws. *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456-57 (1957); *Nw. Adm'rs, Inc. v. B.V. & B.R., Inc.*, 813 F.2d 223, 226 (9th Cir. 1987). To apply those principles, we begin by looking to the CBA's express written terms. *Id.* at 225. In so doing, "[w]e interpret written terms in the context of the entire agreement's language, structure, and stated purpose." *Trs. of S. Cal. IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir. 2008).

As we are reviewing the district court's grant of summary judgment to the Retirees, we must decide whether the CBAs unambiguously establish Retirees' right to company-paid health insurance until age 65. *See Ariz. Laborers, Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir. 1985). The district court did not consider any extrinsic evidence; we similarly limit our analysis to the relevant documents' terms, which we find sufficiently clear in themselves.

We must determine: (A) whether Retirees had a contractual right to premium-free health insurance; if so, (B) whether that right survived the CBAs' expiration; and if so, (C) whether Raytheon could terminate that right unilaterally.

## A.   Contractual Right to Premium-Free Healthcare Coverage

As to the first question—whether the collective bargaining agreements before the one entered into in 2003 required the employer to pay the premiums for Retirees' medical insurance until age 65—we had thought that there was agreement between the parties that the CBAs do so provide. In a post-argument letter, however, Raytheon appears to be disputing that basic premise. We therefore consider the question briefly.

**[2]** First, as to the 1993, 1996, and 1999 agreements, there is absolutely no question as to the intent of the parties to the CBAs. Each of these CBAs includes, in § D(5)(e) of the section covering "Retired Employees Medical Benefits," the assurance that "[t]here is no weekly premium/charge for the Preferred Plan, the Hughes Medical Plan, or an HMO." As the rest of § D(5) specifies that those are the only medical plan choices available to retirees, there is no doubt that the eligible retirees were not required to make any payments toward their medical benefits.[8]

Second, even without that explicit assurance, the CBAs, including the 1990 CBA, established that the employer will pay for eligible retirees' medical coverage. Each CBA specified that:

> For employees who hereafter retire, with at least three (3) years of continuous participation in the contributory option of the Retirement Plan immediately preceding the employee's date of retirement, and who are at least age 55 but less than age 65 and who have five (5) or more years of continuous employment with the Employer, the Employer agrees to continue to provide the Comprehensive Medical Plan coverages for which they were covered while active employees, until the retired employee attains age 65.

Construing "provide" to mean "make available," Raytheon suggests that this section obligates it to make available the same coverages Retirees enjoyed as active employees, but does not obligate the company to pay for that coverage. We cannot agree.

Looking at the 1990 CBA as a whole—the only one as to

---

[8]Some active employees, depending on their choice of benefit plan, did have to pay toward their medical coverage, while others received cash payment from the employer for choosing a less selective plan.

which this contention could matter, as the others contain the additional, express clarification just discussed—one notices, first, that Section D distinguishes between retirees who participated in the Retirement Plan's contributory option and those who participated in the non-contributory option. Whereas § D(1) states that Raytheon must "provide" contributory option participants with the same Comprehensive Medical Plan Coverages they enjoyed as active employees, § D(5) of the 1990 CBA states that "employees who retire with participation in the non-contributory option of the Retirement Plan will not receive employer *provided* medical coverage." (Emphasis added). Sections D(1) and D(5) of the 1990 CBA thus establish a basic dichotomy: Contributory option participants enjoy employer-provided health insurance; non-contributory option participants do not. Article XIV § B(3)(b), describing some of the differences between the Retirement Plan's contributory and non-contributory options, clarifies the meaning of this distinction. It states that "[t]he non-contributory benefit will have different qualifications for normal and early retirement, no automatic cost-of-living payment, *and no eligibility for company-paid medical per Article XIII, Section D, paragraph 5*." (Emphasis added).[9] So, Articles XIII § (D)(5) and XIV § (B)(3)(b), read together, equate "company paid medical" and "employer provided medical." This gloss on the CBA's meaning of "provide" in the context of Medical Plan coverage indicates that "provide" means "pay for" and not simply "make available at the employee's expense."[10]

---

[9]Article XIV § (B)(3)(b) remained substantially the same, in this respect, throughout the 1993, 1996, and 1999 CBAs.

[10]The terms of subsequent CBAs continue to support this interpretation of § D(1). The 1993, 1996, and 1999 CBAs state that, for non-contributory option participants, "the Employer agrees that the employees may extend enrollment in the Comprehensive Medical Plan or HMO coverages for which [non-contributory option participants] were covered as active employees, until the retired employee attains age sixty-five (65)," but further stipulate that "[t]he covered individual(s) shall pay the full retiree

Of course, one could "provide" partial rather than full payment. But, were that the case, there would have to be some indication as to the parties' respective contributions, such as that spelled out for active employees under § A(5). Without an explicit payment schedule, reading "provide" to mean "pay in part" would render the promise effectively illusory, as Raytheon could fulfill its obligation by contributing a penny. *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 490 (6th Cir. 2009) (per curiam) ("The CBA has no limitation on the amount of a company contribution and if the Defendants' argument were accepted, the company presumably could lower the contribution to zero without violating this language. Such a promise would be illusory."). "As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises." *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 845 (6th Cir. 1989) (citing *Cordovan Assocs., Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 861 (6th Cir. 1961)). Finally, § D(5)(e) of the 1993, 1996, and 1999 CBAs confirms this interpretation: With the "provide" language of § D(1) still in place, § D(5)(e) confirms that employees who retire under the retirement plan's contributory option pay "no weekly premium/charge" for the relevant medical plans.

**[3]** We therefore hold that § D(1) of the various CBAs obligates Raytheon *fully* to pay eligible retirees' health insurance premiums until they attain age 65.

---

COBRA Group Premium for the medical plan of benefits in which they are enrolled." 1993 CBA § D(6); 1996 CBA § D(6); 1999 CBA § D(7). The use of the phrase "the Employer agrees that the employees may extend enrollment" instead of "the Employer agrees to continue to provide," in a section otherwise directly analogous to § D(1), indicates that the parties were careful to state clearly a limited obligation to make coverage available in §§ D(6) and D(7), and intended a greater obligation (i.e., "company-paid medical") in § D(1). "[W]hen parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things." *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996).

## B.  Retirees' Medical Coverage Post-Contract

**[4]**  Having concluded that § D(1) obligates Raytheon fully to pay eligible retirees' health insurance premiums, we must address whether this obligation survived after each CBA's expiration. "As a general rule, where the contract at issue has expired, the parties are 'released . . . from their respective contractual obligations' and any dispute between them cannot be said to arise under the contract." *Poore v. Simpson Paper Co.*, 566 F.3d 922, 927 (9th Cir. 2009) (omission in original) (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991)). As with many rules, however, there are exceptions: Certain benefits continue past expiration "where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id.* (quoting *Litton*, 501 U.S. at 206) (internal quotation marks omitted).

Applying normal contract interpretation principles, Retirees' right to premium-free health insurance did not expire with the CBAs. Eligible retirees' right to premium-free health insurance was one of two group coverages for which the CBAs supplied a specific duration — "until the retiree attains age 65."[11] In similar cases, this distinction has been dispositive.

**[5]**  In *Turner v. Local Union No. 302, Int'l Bhd. of Teamsters*, 604 F.2d 1219 (9th Cir. 1979), for example, the reason "appellant's rights to the health and welfare benefits . . . . could be terminated at the end of any one of the collective bargaining agreements" was that "[n]one of the documents

---

[11]At least some of the CBAs provided cost-free life insurance to certain "eligible employees retiring during the term of this Agreement," for five years after retirement, in decreasing amounts. After the fifth year, retirees were required to pay for their insurance, in an amount "subject to change based on claims experience." Group Benefits § C, Retiree Group Life Insurance Plan.

establishing the . . . benefits made any representation as to the length of the period during which these benefits would continue to be paid, other than 'throughout the term of this agreement.' " *Id.* at 1225. In contrast, where a CBA links eligibility for a particular right "to an event that would almost certainly occur after the expiration of the agreement"—e.g., turning 65 or becoming eligible for Medicare—such linkage "signal[s] the parties' intent to continue retirement health benefits notwithstanding expiration." *Quesenberry v. Volvo Trucks N. Am. Retiree Healthcare Benefit Plan*, 651 F.3d 437, 441 (4th Cir. 2011); *see Poore*, 566 F.3d at 924, 927 (holding that jurisdiction existed under the LMRA because the retirees had established "a colorable claim that they have a right to benefits which survived the expiration of the remainder of the agreement," where a benefit booklet incorporated into the CBAs stated that medical coverage "would continue until the retiree 'bec[ame] eligible for Medicare, attain[ed] age 65, or until . . . death, whichever occurs first,' " but stating that there was ambiguity regarding how this commitment could be modified (alterations and omission in original)).[12] Because the CBAs here require Raytheon to "continue to provide" Retirees with premium-free healthcare coverage until they reach age 65, Raytheon's obligation to pay Retirees' medical insurance premiums continued after the CBAs themselves expired.[13]

---

[12]*See also, e.g.*, *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292 (4th Cir. 2011); *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 918 (6th Cir. 2000). *Compare Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 307 (7th Cir. 1996) (Flaum, J.) (holding that the CBA's "clear provision for lifetime benefits. . . . abrogated whatever right [the employer] may have had to terminate coverage") *with UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 705 (7th Cir. 2003) (Flaum, J.) (distinguishing *Diehl*, and holding that a company could terminate ongoing retiree health benefits, on the ground that the CBA "contain[ed] no statement regarding the period of time during which retirees would be entitled to benefits").

[13]The CBAs' use of specific durational language to limit the employer's obligations to a fixed period for each retiree—i.e., until the retiree attains age 65, and for similarly fixed periods for spouses and dependants—differentiates this case from those in which courts have recognized the employer's "natural[ ] reluctan[ce] to saddle itself with [the] *indefinite* future obligations" inherent in a promise to provide benefits for life. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 609 (7th Cir. 1993) (en banc) (emphasis added).

### C. Unilateral Abrogation of Fully-Paid Retiree Medical Coverage

**[6]** Having resolved these fairly straightforward issues, we come to the question at the heart of this case: Do the Plans' provisions limit Raytheon's contractual obligation, bilaterally agreed upon with the union representing now-retired employees while they were still employed, to provide premium-free healthcare coverage for eligible retirees? We conclude that they do not. The Plans' reservation-of-rights provisions were not incorporated into the CBAs with regard to the obligation to pay for eligible retirees' medical coverage, and the CBAs expressly prevented Raytheon from unilaterally abrogating its contractual premium-payment obligations.

### 1. The CBAs' relationship to the Plans

In arguing that the CBAs incorporated the Plans' reservation-of-rights provisions, Raytheon relies on three separate CBA clauses — Sections J(4), J(5), and D(2). We address each in turn.

#### a. Section J(5)

First, Raytheon argues that § J(5) of the CBAs' Group Benefits Article expressly subordinates the CBAs' group benefits provisions in their entirety (including §§ D(1) and D(5)(e)) to the Plans' terms, including the Plans' reservation-of-rights provisions. Section J(5) of the various CBAs states that "[a]ll benefits of employees [and] retired employees . . . are subject in every respect to the terms of the applicable Plan documents under which payment is claimed." Raytheon maintains that the term "benefits" includes commitments regarding plan contributions and premium payments, and concludes that § J(5) subordinates § D(1)'s promise—that Raytheon would fully pay eligible retirees' health insurance—to the Plans' reservation-of-rights provisions, thereby allowing unilateral

modification of the CBAs' promises of employer-provided retiree health insurance.

[7] We disagree. Generally, under ERISA, "benefits" are payments made or services provided, pursuant to the plan, to claiming participants or beneficiaries, while premiums or contributions cover the cost of those "benefits." *Compare* 29 U.S.C. § 1002(22)-(23) (benefits are amounts paid out of the plan)[14] *with* 29 C.F.R. § 2520.102-3(p) (contributions are amounts paid into the plan);[15] *see also Kadane v. Hofstra*

---

[14]29 U.S.C. § 1002(22) states:

The term "normal retirement benefit" means the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age. The normal retirement benefit shall be determined without regard to—

(A) *medical benefits*, and

(B) disability benefits not in excess of the qualified disability benefit.

For purposes of this paragraph, a qualified disability benefit is a disability benefit provided by a plan which does not exceed the benefit which would be provided for the participant if he separated from the service at normal retirement age. For purposes of this paragraph, the early retirement benefit under a plan shall be determined without regard to any benefit under the plan which the Secretary of the Treasury finds to be a benefit described in section 1054(b)(1)(G) of this title. (Emphasis added).

Section 1002(23) declares:

The term "accrued benefit" means—

(A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age, or

(B) in the case of a plan which is an individual account plan, the balance of the individual's account.

The accrued benefit of an employee shall not be less than the amount determined under section 1054(c)(2)(B) of this title with respect to the employee's accumulated contribution.

[15]29 C.F.R. § 2520.102-3(p) provides that "[t]he sources of contributions to the plan — for example, employer, employee organization,

*Univ.*, 682 F. Supp. 166, 169-70 & n.3 (E.D.N.Y. 1988) ("The fact that these employer contributions are transformed into Plan benefits as they are paid out pursuant to the Plan does not make the contributions plan benefits."); *cf. Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008) ("Contributions to a plan and benefits owed by a plan are not necessarily equivalent [in amount] . . . ."). Thus, for example, a defined contribution pension plan requires the employer to contribute a certain percentage of payroll or profits to participants' accounts, whereas a defined benefit plan promises to pay participants a fixed benefit upon retirement. *See, e.g.*, *Hurlic v. S. Cal. Gas Co.*, 539 F.3d 1024, 1029 (9th Cir. 2008) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 637 n.1 (1990)).

**[8]** Although these examples center on pension benefits, the general concept that contributions and benefits differ and are separately provided for in ERISA plans is not so limited, as the reference to "medical benefits" in § 1002(22) indicates. A right to employer contributions may *also* be construed as a benefit where the failure to make contributions economically undermines the monetary benefits promised. *See Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1253 (11th Cir. 2008). Here, however, as we have seen, the promise to "provide" coverage assures that the employer will pay the contributions. And § J(5)'s language also otherwise implies the narrower meaning outlined above.

**[9]** Section J(5) states that benefits are subject to the terms of the Plan "under which payment is claimed." This phrasing closely resembles the statutory language used in ERISA to

---

employees — and the method by which the amount of contribution is calculated" shall be included in the summary plan description of both employee welfare benefit plans and employee pension benefit plans. The regulation further notes that "[d]efined benefit pension plans may state without further explanation that the contribution is actuarially determined."

refer specifically to a participant's claim for payments *from the plan*. *See* 29 U.S.C. § 1133(1) (requiring the employer to "provide adequate notice in writing to *any participant or beneficiary whose claim for benefits under the plan* has been denied") (emphasis added).

The language of § J(5) also resembles the phrasing used by Raytheon's Plans. Section 2.5 of the 1999 and 2003 Plans defines "Benefits" as "any *payments or services made under the Plan to a Participant* or other person eligible to receive payments or services pursuant to any Benefit Program." (Emphasis added). Similarly, § 5.3 of the 1999 and 2003 Plans, entitled "Contributions Used to Provide Benefits," states that "[c]ontributions shall be held by the Employer and distributed for the benefit of Participants solely for the *payment of Benefits under, and in accordance with the provisions of, the applicable Benefit Program pursuant to which such contributions were made*." (Emphasis added). Raytheon's Plans thus confirm that the company distinguished "contributions" from "benefits," and meant to refer only to the latter by agreeing to the terms of § J(5).[16]

---

[16]Section J(5)'s explicit focus on "benefits," as distinct from "contributions," distinguishes this case from *United Mine Workers v. Brushy Creek Coal Co.*, 505 F.3d 764 (7th Cir. 2007). The retiree plaintiffs in that case, relying on a clause in a nationwide CBA—which stated that " 'the benefits and benefit levels provided by an Employer under its Employer plan are established for the term of this Agreement only, and may be *jointly amended* or modified in any manner at any time after the expiration or termination of this agreement' "—argued that Brushy Creek had violated the LMRA and ERISA when it relied on a reservation-of-rights clause contained in its healthcare plans to modify unilaterally the retirees' medical benefits. *See id.* at 766-67 (emphasis added). "[A]nother provision of the nationwide collective bargaining agreement," however, broadly "state[d] that 'the specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.' " *Id.* at 767. Observing that the joint amendment clause "appear[ed] in the part of the nationwide agreement captioned 'general description of the health and retirement benefits,' " the Seventh Circuit held that the broad subordination provision required the court to disregard the joint amendment clause, because it was inconsistent with the plans' reservation-of-rights provisions. *Id.* Here, by contrast, the subordination clause is narrower, pertaining only to the benefits provisions in the Plans.

Further, the structure of the CBAs confirms our understanding. The CBAs first cover in detail, as we have seen, the payments to be made *for* medical coverage, as well as the types of "coverages" available—for the employee or retiree alone, or for various family configurations. Absolutely nothing in the CBAs specifies what payments will be made to or on behalf of covered individuals for which medical services and under what circumstances.[17] In other words, the "benefits" provided are not spelled out in the CBAs, but instead "are subject in every respect to the terms of the applicable Plan documents under which payment is claimed."

**[10]** We therefore reject Raytheon's contention that § J(5) evinces the parties' intent to subordinate to the Plans the CBAs' provisions regarding healthcare coverage. Instead, § J(5) means exactly what it says—that when a covered individual claims medical services or payment for a medical cost, whether he or she is entitled to the "benefits" claimed is determined according to the "applicable Plan documents."[18]

---

[17]As we are all aware, such provisions can be quite complex and change regularly. *See Reese v. CNH Am. LLC*, 574 F.3d 315, 324 (6th Cir. 2009) (citing *Diehl*, 102 F.3d at 309). The provisions of a healthcare coverage plan typically spell out the participants' substantive medical benefits— e.g., which office visits, hospital stays, laboratory tests, and drugs are covered, including any limitations to particular providers, referral requirements, prior authorization requirements, and so on. *See, e.g., Brushy Creek*, 505 F.3d at 766 ("The collective bargaining agreement entitles employees who retire during its term, such as the 63 individual plaintiffs, to health benefits 'for life.' The memorandum of understanding creates the health plan that lists the benefits to which employees are entitled for life."); *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1290-91 (6th Cir. 1991); *cf.* 42 U.S.C. § 18022(b)(1) (enumerating some of the general benefits categories that must be included in a health plan's "essential health benefits package").

[18]Raytheon also argues that Retirees' right to company-paid healthcare coverage premiums would be meaningless if Raytheon could gut the substantive medical benefits, pursuant to § J(5) and the Plans' reservation-of-rights provisions. This position is rather ironic, as Raytheon is essentially arguing that the CBA provisions *are* meaningless. In any event, we do not

### b. Section J(4)

Raytheon also argues that § J(4) subordinates the CBAs' Group Benefits provisions to the Plans. That section states that "[n]othing herein shall change any provisions of the Group Benefit Plans *provided under this Article XIII [or XII] as currently in effect,* other than those changes specifically referred to herein." (Emphasis added). Quoting this provision only partly, Raytheon contends that § J(4) entirely subordinates the CBAs' group benefits provisions to any future changes in the Plans.

Raytheon is incorrect. Section J(4)'s language demonstrates that the provision was a temporal one, not one directed at allowing unilateral Plan provisions promulgated after the CBA went into effect to trump the agreement the employer negotiated with the union. The clause speaks of "changes" from the Plans "currently in effect"—that is, the Plans in effect at the time the CBA was entered into. As such, it simply prevented the CBAs from modifying the pre-existing Plans by omission. Section J(4) did not, as Raytheon would have it, permit *future* changes in the Plans unilaterally to override the CBAs.[19]

---

dispute that a company may assume contractually binding contribution obligations while reserving the right to alter unilaterally employees' substantive medical benefits. *See Mississippi Power Co. v. NLRB*, 284 F.3d 605, 624-25 (5th Cir. 2002). Moreover, although we do not presume to resolve § J(5)'s full scope, it is at least plausible to construe that provision as authorizing Raytheon to modify the benefits plans *so long as* such modifications are reasonably commensurate with the benefits originally provided under the CBA and reasonable in light of changes to the provision of healthcare generally. *See Reese*, 574 F.3d at 326 (citing *Diehl*, 102 F.3d at 310).

[19]We note that this interpretation accords with, rather than contradicts, the zipper provision, which (as discussed further below) prohibits Raytheon from modifying the Plans in a manner that would violate its contractual commitments under the CBAs.

### c.    Section D(2)

Finally, Raytheon suggests, in passing, that § D(2)—which states that "Retired Employees Medical Benefits will be administered by the Employer in accordance with the provisions of the Comprehensive Medical Plan Document prepared by the Employer"—incorporates the Plans, and so their reservation-of-rights provisions, by reference.

Section D(2) cannot bear even the slim weight Raytheon places on it. The provision nowhere purports to authorize Raytheon to terminate or modify its contractual agreement to pay Retirees' healthcare coverage premiums. Rather, it obligates Raytheon to *administer* medical benefits (which, again, are not themselves spelled out in the CBAs) according to the Plans. In other words, not only are the terms of the medical benefits spelled out in the Plans, pursuant to § J(5), the administrative manner in which they are provided—i.e., whether reimbursement or direct payments to services providers are available; what claims-filing forms must be used; how a covered individual can dispute a benefits denial; and so on —are all determined under Plan documents and not spelled out in the CBAs. Thus, § D(2) simply reiterates and makes more specific the division of responsibility between the CBAs and the Plans, clarifying that the latter spell out not only which specific medical costs will be covered, but also in what manner. *See, e.g.*, *Karl Schmidt Unisia, Inc. v. UAW*, 628 F.3d 909, 916 (7th Cir. 2010) (holding that a CBA's passing reference to the employer's pension plan—" '[the Pension Plan] shall continue in effect' for the term of the CBA"—did not incorporate the Pension Plan's dispute resolution procedure into the CBA); *Printing Specialties & Paper Prods. Union Local 680 v. Nabisco Brands, Inc.*, 833 F.2d 102, 105 (7th Cir. 1987) ("The collective bargaining agreement did not incorporate the provisions of the Pension Plan, but merely stated that Nabisco would keep the Pension Plan in full force and effect. . . . [T]he 'mere mentioning of the Retirement Plan in the General [collective bargaining] Agreement is insuffi-

cient reason to construe the Retirement Plan as part and parcel of the General Agreement.' ") (alterations in original) (quoting *RCA Corp. v. Local 241, Int'l Fed'n of Prof'l & Technical Eng'rs*, 700 F.2d 921, 927 (3d Cir. 1983)).

### d. Conclusion

**[11]** Looking at §§ J(5), J(4), and D(2) together, it is evident that the bargaining parties assigned the CBAs and the Plans different functions with respect to medical coverage. Section D(2) requires the employer to administer Plan "benefits" in accordance with Plan documents. Section J(5) ensures that Plan "benefits" are governed by the Plan documents in which they appear. Finally, Section J(4) guarantees that the CBAs do not modify preexisting Plans absent the express agreement of the bargaining parties. Taken altogether, these three provisions ensure that the Plans, not the CBAs, govern the payments or services provided to the concerned individuals. But none of these provisions allows the employer unilaterally to override express terms in the bilateral CBA, governing who is to be covered and who is to pay for coverages, whether by unilaterally writing conflicting language into the Plans referenced by the CBAs or otherwise. The Plans' reservation-of-rights provisions therefore cannot qualify the CBAs' promise of premium-free healthcare coverage, as that promise is not affected by the Plans. *See, e.g.*, *Int'l Ass'n of Machinists & Aerospace Workers v. Masonite Corp.*, 122 F.3d 228, 233 (5th Cir. 1997); *Diehl*, 102 F.3d at 307.[20]

---

[20]Our conclusion in this regard accords with a common-sense understanding of the collective bargaining context. Active employees know that their collective bargaining influence will wane upon retirement, because the retirement benefits of current retirees are not mandatory subjects of collective bargaining, *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181-82 & n.20 (1971), and because retirees generally do not pay union dues, vote in union elections, or vote in representation elections, *see Bidlack*, 993 F.2d at 609. Active employees thus have strong incentives to lock-in their *future* retiree welfare benefits through collective bargaining, as a form of deferred compensation. *See id.* This

### 2.  The Plans' Reservation-of-Rights Provisions

**[12]** Our conclusion thus far does not depend on the precise reach of the reservation-of-rights provisions contained in the Plans and relied on by Raytheon. But broadening the scope of our inquiry to include those provisions reinforces our conclusion, for a number of reasons.

### a.  The  Reservation-of-Rights  and  No-Vesting Clauses

First, Raytheon's Petition for Rehearing states that "the relevant Plans were issued in 1994, 1997, 1999, and 2003." Indeed, there is *no* language from any pre-1994 Plan recited or relied upon by Raytheon as limiting or qualifying the promise of fully paid medical benefits to age 65 made in the 1990 and 1993 CBAs. The question whether Raytheon's reservation-of-rights provisions in its Plans authorized it unilaterally to limit its premium-payment obligations therefore arises at all only with regard to employees who retired after the 1994 Plan went into effect.

As to the reservation-of-rights provisions that are in the record, Raytheon relies on four: a limited reservation-of-rights in the 1994 and 1997 Plans; a differently worded reservation-of-rights in the 1999 and 2003 Plans; a no-vesting clause in

reasoning is particularly salient here, because retirees who participated in the retirement plan's contributory option actually gave up three percent of their eligible compensation in order to enjoy a specific slate of collectively bargained privileges, including premium-free healthcare coverage. Raytheon's position is essentially that contributory option participants forfeited three percent of their eligible compensation in the hopes of one day attaining a collectively bargained privilege that could be unilaterally abrogated at the employer's discretion. Of course, a CBA *could* so provide, explicitly or through a broad subordination clause such as the one in *Brushy Creek. See* 505 F.3d at 767. But we should not read such an authorization into a CBA when it does not appear there.

the 1999 and 2003 Plans; and a clause in the 1999 and 2003 Plans granting Raytheon sole authority to determine participants' contributions ("the contributions clause").

In general, a reservation-of-rights provision is effective only against contractual obligations explicitly covered by the reservation. In *Vallone v. CNA Fin. Corp.*, 375 F.3d 623 (7th Cir. 2004), for example, the Seventh Circuit held that a company's reservation-of-rights clause allowed it to abrogate a promise of lifetime benefits, because the clause applied to all benefits described in the company's retirement guide, and the promise of lifetime benefits was contained therein. *See id.* at 636-37. Conversely, in *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832 (8th Cir. 1997), the Eighth Circuit held that a reservation-of-rights provision contained in an employee handbook did not apply to the handbook's arbitration clause, because "[t]he reservation of rights language refers to the handbook provisions relating to employment, not to the separate provisions of the arbitration agreement." *Id.* at 835.

Here, all of the provisions relied on by Raytheon, except for the contributions clause, apply exclusively to rights granted under the Plans and incorporated Benefit Programs (e.g., Raytheon's Retiree Medical Benefits Program), rather than to rights granted under the CBAs. The 1994 and 1997 Plans' reservation-of-rights provision, for example, states that the Employer "reserves the right to alter, amend, modify, revoke or terminate in whole or in part *the Plan*, except as provided in any agreement with a Collective Bargaining Agent." (Emphasis added). This clause is thus expressly limited in scope to the *Plans*, and affirmatively requires Plan amendments to conform to the CBAs. Such a provision does not authorize the modification of the CBA, but instead expressly recognizes that the CBA prevails over any Plan modifications. *See McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 425 (6th Cir. 2004) (holding that a modification is not "subject to" a CBA where it contradicts the CBA's express terms); *cf. Poore*, 566 F.3d at 927 (rejecting an

employer's argument that it could terminate retirees' benefits at any time, where the plan document at issue stated that its terms could be modified "subject to negotiation with the Union") (internal quotation marks omitted).

The parallel reservation-of-rights provision in the 1999 and 2003 Plans does not refer to the CBAs, but its scope remains limited to the Plans and incorporated Benefit Programs. It provides that the Employer "reserves the absolute right to *amend the Plan* and any or all Benefit Programs incorporated herein from time to time, including, but not limited to, the right to reduce or eliminate benefits provided *pursuant to the provisions of the Plan* or any Benefit Program as such provisions currently exist, or may hereafter exist." 1999 Plan § 8.1; 2003 Plan § 8.1. (Emphases added). Similarly, the 1999 and 2003 Plans' no-vesting clause states that "[n]o [Plan] Participant . . . shall have any right to, or interest in, *any benefits provided under this Plan* . . . except as specifically provided under a Benefit Program." 1999 Plan § 9.2; 2003 Plan § 9.2. (Emphasis added). For the same reasons surveyed with respect to the meaning of "benefits" under the CBA, these Plan provisions do not affect, because they do not purport to affect, the contribution obligations imposed by the CBAs. Instead, they focus on the employer's right to change the *benefits* provided—that is, the terms of the payments for medical services or direct services provided to covered employees. This focus is entirely consistent with the dichotomy discussed earlier: The CBAs leave the designation of the precise medical benefits provided, and the procedures for obtaining them, to the Plans, and the Plans permit the Employer to modify the Plans accordingly.

At least with respect to the 1999 Plan, the timing of the negotiations further supports this conclusion. The Raytheon Medical Plan—the only health benefits plan available under the 1999 CBA—was adopted effective January 1, 1999. The 1999 CBA, however, was negotiated subsequent to the 1999 Plan and did not become effective until October 25, 1999. The

later-adopted CBA clearly states that "written notice of desire to modify or amend" the CBA may be given by either party and provides the manner in which the parties will negotiate any proposed modification. It defies reason to accept Raytheon's contention that the earlier-adopted 1999 Plan obviated the company's obligation under the later-adopted CBA to provide written notice and negotiate with the Union prior to changing the Retirees' entitlement to premium-free healthcare.

### b. The Contributions Clause

Section 5.2(a) of the 1999 and 2003 Plans, however, *does* purport to govern the contributions required of Plan participants. It states that "Participants' contributions shall be subject to change by and in the sole discretion of the Company." Raytheon argues, albeit somewhat in passing, that this contributions clause gave it total discretion to adjust Retirees' premium payments as of 1999. We reject this assertion.

First, it is noteworthy that the language of the contributions provision is not limited to retirees. Thus, if read without regard to the CBAs, it would appear to allow the Employer unilaterally to abrogate the commitments made in the CBAs with respect to paying for the medical benefits of active employees during the CBA's term.

As a general matter, we are skeptical that the Union would have agreed to give Raytheon unilateral authority to modify the contribution requirements for retirees *and* active employees. Doing so would render non-binding both § D's contributory/non-contributory dichotomy and § A(5)'s detailed schedule for maximum active employee contributions. In other words, Raytheon's proposed interpretation of the scope of the contributions clause in the 1999 and 2003 Plans would permit it to "increase or decrease its [collectively bargained] contribution to the existing policy" as it sees fit, "without any consultation with or recourse for the Union."

*See NLRB v. Gen. Elec. Co.*, 418 F.2d 736, 747 (2d Cir. 1969).

At oral argument, Raytheon contended that we need not interpret the contributions clause and other reservation-of-rights provisions in light of their implications for active employees, because the statutory rights of active employees are distinct from the rights of retirees. *See Rockford Powertrain*, 350 F.3d at 704 n.1 (citing *Pittsburgh Plate Glass*, 404 U.S. at 188). Specifically, Raytheon noted, accurately, that the National Labor Relations Act ("NLRA") generally imposes a statutory obligation to bargain regarding modifications to the conditions of employment for active employees. *See* 29 U.S.C. §§ 158(a)(5), (d). But, contrary to Raytheon's submission, the NLRA does not necessarily require bargaining where there is an applicable reservation of management's rights to act unilaterally. *See, e.g.*, *Conoco Inc. v. NLRB*, 91 F.3d 1523, 1527-28 (D.C. Cir. 1996) (per curiam) (holding that an applicable management's rights clause authorized the unilateral modification of rights and obligations, where such unilateral modification was expressly provided for by the CBA). If, as Raytheon maintains, the CBAs incorporated the Plans wholesale, the Plans' reservation-of-rights provisions would apply equally to both groups, as the reservation-of-rights provisions themselves do not distinguish between the two. Such a result would provide a "convincing *reductio ad absurdum*" of Raytheon's argument, because, "as a matter of contractual interpretation, it seems highly unlikely that the Union would have ever considered such a clause" with respect to its active employees. *See Gen. Elec. Co.*, 418 F.2d at 747.[21]

On our view of the division of responsibility between the CBAs and the Plans, however, this anomaly does not arise. As we have explained, the bargaining parties to the CBAs did not

---

[21]We note that this aspect of our analysis does not apply to the 2003 Plan, which governed the medical benefits of retirees alone.

need to contemplate such a possibility, because they understood that the CBAs incorporated the Plans' reservation-of-rights provisions only insofar as the provisions pertained to modifying the substance of, or the procedures for payment or direct provision of, medical services. Contribution questions were thus reserved to the CBAs, and not subject to the Plans' reservation-of-rights provisions.

Solidifying our conclusion in this regard is the consideration that the CBAs themselves expressly preclude the very result Raytheon seeks to effect. In each CBA, the Current and Supplemental Agreements provision, Article XIX § F, contains both an integration clause and, more importantly, a modifications clause. The integration clause states that the CBA "constitutes the sole and entire existing agreement between the parties . . . for the period of this Agreement"; the modifications clause separately provides that "[n]o alteration, variation, waiver *or modification* of any of the terms, conditions, or covenants contained herein . . . shall be valid or binding *unless such is made and executed in writing between the parties hereto*." (Emphasis added).[22]

Such hybrid provisions are called "zipper clauses." *See, e.g.*, *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1159 (9th Cir. 2000). They are traditionally "intended to foreclose claims of any representations outside the written contract aside from those made in another written document executed by the parties," thus "zipping up" the CBA. *See id*. Read together with the contributions clause's reservation-of-rights, however, the zipper provision at issue here takes on added significance. Specifically, because the zipper provision prohibits modification except through a written instrument executed between the parties, it affirmatively prevents the

---

[22]Although the zipper provision's integration clause is limited to "the period of this Agreement," the modifications clause does not include this limitation.

unilateral modification of retirees' contractual rights under the CBAs.

We find *Prater v. Ohio Education Association*, 505 F.3d 437 (6th Cir. 2007), instructive as to this matter, although the precise problem here is slightly different from the one there at issue. In *Prater*, the employer unilaterally terminated retirees' health benefits pursuant to a reservation-of-rights provision contained in Summary Plan Descriptions ("SPDs") not incorporated in the relevant CBAs. *See id.* at 440-41, 444-45. Under Sixth Circuit precedents, an unincorporated SPD's reservation-of-rights clause will be enforced if the union does not grieve or file suit in response to the employer's reservation of the right to modify a CBA, so long as the reservation was sufficiently clear that the union can fairly be expected to protest immediately upon notification. *See McCoy*, 390 F.3d at 424-25 (citing *Maurer*, 212 F.3d at 913, 919).[23] *Prater* held that the unions could not fairly be expected to protest the SPD's reservation-of-rights clause, because the court observed that the CBAs' zipper provisions—which provided that the agreements could not be amended without signed, mutual consent—effectively precluded any unilateral termination of rights. *See* 505 F.3d at 444-45. Thus, "the unions . . . could not fairly 'be compelled to protest the SPD language' — at least when the summary does not explicitly renounce the collective bargaining agreement — because both sets of [CBAs] explicitly said that their bargained-for rights could not be terminated in such a manner." *Id.* at 445 (quoting *McCoy*, 390 F.3d at 425) (citation omitted). "When a contract contains formal procedures requiring mutual, written assent to amend," the court wrote, "that language preempts future unilateral termination of rights." *Id.* at 444.

---

[23]*McCoy*, for example, held that an SPD's reservation-of-rights provision, which stated that any termination of benefits was " 'subject to the provisions of any applicable collective bargaining agreement,' " *id.* at 421, could not "fairly . . . have prompted the union immediately to protest," *id.* at 425.

*Prater*'s holding does not directly apply to this case, but its rationale does. Because the particular right at issue—that the company would pay for eligible retirees' medical insurance—is expressly contained in the CBAs themselves, it is protected from unilateral amendment by the CBAs' zipper provision.[24] Raytheon's assertion of unilateral authority to abrogate that right, under the contributions clause, would both go beyond the degree to which the CBAs explicitly deferred to the Plans and run headlong into the zipper provision's prohibition against unilateral modification of the CBA. *See Brushy Creek*, 505 F.3d at 766-67 (observing that a clause requiring "joint amendment" of the CBA was inconsistent with a plan's reservation-of-rights provision, but holding that the CBA's subordination provision required the court to resolve the inconsistency by disregarding the joint amendment clause).

This understanding of the relationship between the CBAs and the 1999 and 2003 Plans' contributions clause does not wash out the clause's importance in other respects. The contributions clause authorized Raytheon unilaterally to adjust active employees' weekly contribution requirements, so long as Raytheon did not require more than the maximum amount specified under § A(5). It also authorized Raytheon unilaterally to alter the contribution requirements of retirees who participated in the retirement plan's non-contributory option, and so were not promised any employer contribution at all. Finally, and most obviously, it permitted Raytheon to change the contributions required of those unrepresented employees covered by the Plans but not covered by the CBAs at all. The clause did not, however, authorize Raytheon to abrogate eligible employees' contractual right to company-paid health insurance contributions during the term of the CBA, or to

---

[24]*Rockford Powertrain*, for example, held that an ERISA plan's reservation-of-rights clause authorized the employer to amend welfare benefits, despite the CBA's prohibition on unilateral modifications, because the CBA did not provide for any particular benefits, only the Plan did. *See* 350 F.3d at 704-05.

eliminate eligible retirees' right to company-paid insurance until age 65, in accordance with the agreement in effect at the time they retired.

## IV

As to the Retirees' cross-appeal, the Retirees contend that the district court erred in rejecting their claims for punitive and extra-contractual damages under the LMRA or ERISA. We do not agree.

**[13]** As Retirees concede, punitive and extra-contractual damages are generally not allowed under the LMRA for breach of a CBA. *See Moore v. Local Union 569 of Int'l Bhd. of Elec. Workers*, 989 F.2d 1534, 1542 (9th Cir. 1993) ("The general rule . . . is that punitive damages are not allowed in actions for breach of contract brought under Section 301 [of the LMRA]."); *Desert Palace, Inc. v. Local Joint Exec. Bd.*, 679 F.2d 789, 794 (9th Cir. 1982) ("Generally, the remedy for breach of a collective bargaining agreement is limited to an award of compensatory damages. Ordinarily, an award that exceeds the monetary loss which an injured party suffered as a result of a contract breach is considered punitive."). Retirees contend, however, that there are exceptions to this general rule: A court may award punitive damages if it would deter persistent misconduct and may award extra-contractual damages if the defendant's conduct was particularly likely to result in serious emotional distress.

**[14]** We need not resolve whether such exceptions exist. Retirees pleadings do not allege sufficient facts to support any claim for punitive and extra-contractual damages. In particular, "[e]ven if we were to conclude that punitive damages are available in appropriate circumstances," Retirees have alleged no facts showing that "the defendants' conduct in this case is . . . sufficiently 'outrageous' or 'egregious' to warrant an award of punitive damages against them." *Wilson v. Int'l Bhd. of Teamsters*, 83 F.3d 747, 755 (6th Cir. 1996). We therefore

affirm the district court's grant of judgment on the pleadings to Raytheon as to the availability of punitive and extra-contractual damages.

## V

In sum, we hold: that Raytheon expressly agreed to provide 100% company-paid healthcare coverage for eligible Retirees; that Raytheon's obligation survived the expiration of the CBAs; and that Raytheon's agreed-upon obligation could not be unilaterally abrogated by Raytheon, regardless of the rights Raytheon reserved for itself in Plan documents, because the CBAs did not incorporate the Plans' reservation-of-rights provisions with respect to employer contribution issues, as opposed to issues relating to the provision of monetary or in-kind benefits for particular medical services. We further hold that the district court did not err in rejecting Retirees' claim for punitive and extra-contractual damages.

**AFFIRMED.**