McCormack, C.J. (dissenting).
The majority holds that the defendant, Macomb County (the County), is entitled to summary disposition because the County's contractual promise to provide retiree healthcare benefits does not extend beyond the duration of the County's collective-bargaining agreements (CBAs) with its employee unions. It reasons that the general durational clauses in the CBAs *621 unambiguously govern that promise because the agreements neither include language exempting retiree healthcare benefits from that general period nor explicitly promise healthcare benefits for the retirees' lifetimes.
The plaintiffs, retired County employees, believe the specific promise of retirement healthcare extended beyond the general contract period. Their understanding has commonsense appeal: they thought retirement healthcare was a promise that they would have healthcare for the period of their retirement. They cite specific language in the agreements governing retiree healthcare to support their view.
I agree with the majority's understanding of the principles that guide our review of this dispute. But I disagree with its application of those principles to these agreements. Because the CBAs are ambiguous about whether the County promised retiree healthcare benefits for not more than three years, or instead for the full period of plaintiffs' retirements, I would send the question to the fact-finder, who may properly consider extrinsic evidence to resolve it. I respectfully dissent.
**328 I. BACKGROUND
For nearly three decades, the County has provided healthcare benefits to its retired employees. Those benefits are described in the CBAs that the County entered into with the unions that represented various groups of County employees.[1] To qualify for the benefits, the CBAs require three things: a retiree must (1) satisfy a years-of-service requirement, (2) be separated from employment with the County because of retirement, and (3) be eligible to receive benefits under the County's retirement ordinance. See Part III of the majority opinion.
Each CBA also contained a general, three-year durational provision. The final article of the 2008-2010 CBAs, for example, provided, "This Agreement shall continue in full force and effect until December 31, 2010." The parties agree that earlier CBAs contained either this same durational clause (varying only in end date) or a substantially similar one. The historical practice was that at the end of every three-year period,[2] the County and the unions would enter into a successive CBA for another three-year term.
Beginning in 2009, in the middle of the 2008-2010 CBAs, the County unilaterally implemented changes in the retirees' healthcare benefits. According to the plaintiffs, these changes resulted in some retirees paying more for prescription copays, changed deductibles, and reduced plan options. The plaintiffs filed this class action on behalf of themselves and a class of about 1,600 retirees, all of whom retired under these **329 CBAs and received retiree healthcare benefits from the County. The plaintiffs believe that the County violated the 2008-2010 CBAs by making the changes unilaterally, without the retirees' consent. The County responded that the benefit changes were consistent with and allowed by the CBAs.
But a more fundamental dispute arose. The plaintiffs sought a permanent injunction requiring the County to continue providing prechange healthcare benefits for the plaintiffs' lifetimes and to prevent the County from changing those benefits. According to the County, however, at no time did any of the CBAs (the 2008-2010 CBAs *622 and their predecessors) provide a retiring employee with healthcare benefits for the retiree's lifetime. Instead, the County contends that the plaintiffs' right to receive healthcare benefits was subject to each CBA's three-year durational clause. Thus, the County argues, none of these plaintiffs had a right to continued healthcare benefits beyond any three-year term, absent a new contractual promise in a successive CBA. Or, put differently, each CBA only guaranteed retirement healthcare for the three-year period it governed. After that, the retirees had-and have-no right to future healthcare benefits, absent a new contractual promise from the County.
The plaintiffs, on the other hand, believe that the County promised to provide union members who retired during the term of a CBA with specified healthcare benefits for their retirements; that is, for the rest of their lives. They believe the CBAs, and three provisions in them in particular, support their view. Each provision specifically governs retiree healthcare.
One clause provided that coverage would end upon the death of the retiree or, if the retiree made a spousal **330 election, continue for the retiree's spouse after the retiree's death (the survivor clause):
Coverage shall be limited to the current spouse of the retiree, at the time of retirement, provided such employee shall retire on or after January 1, 1974. Coverage for the eligible spouse will terminate upon the death of the retiree unless the retiree elects to exercise a retirement option whereby the eligible current spouse receives applicable retirement benefits following the death of the retiree.
Another clause required retirees to enroll in federally funded healthcare upon reaching age 65, after which the County's obligation was to provide only supplemental coverage (the supplemental-care clause):
Retired employees and/or their current spouse, upon reaching age 65, shall apply if eligible, and participate in the Medicare Program at their expense as required by the Federal Insurance Contribution Act, a part of the Social Security Program, at which time the Employer's obligation shall be only to provide "over 65 supplemental" hospital-medical benefit coverage. Failure to participate in the aforementioned Medicare Program, shall be cause for termination of Employer paid coverage of applicable hospital-medical benefits, as outlined herein for employees who retire and/or their current spouse.
Finally, the CBAs addressed temporarily suspending the coverage of any retiree who becomes gainfully employed (the subsequent-employment clause):
Employees who retire under the provisions of the Macomb County Employees' Retirement Ordinance, and/or their current spouse, who subsequently are gainfully employed, shall not be eligible for hospital medical benefits, during such period of gainful employment, as hereinafter defined: Gainful employment is defined as applying to retiree and/or spouse of retiree who are employed subsequent to the employee retirement. If such **331 employment provides hospital-medical coverage for both retiree and spouse, the County is not obligated to provide said coverage unless and until the coverage of either person is terminated. If the coverage is not provided to retiree and spouse, the County will provide hospital-medical coverage for the person not covered. [Paragraph structure omitted.]
II. AMBIGUITY
The majority agrees with the County. The majority holds that because the CBAs *623 do not expressly provide a separate end date for retiree healthcare benefits, the CBAs' general, three-year durational clauses unambiguously govern these benefits. The majority does not believe that the survivor clause, the supplemental-care clause, or the subsequent-employment clause create ambiguity because those events might occur during the three-year term of the agreement. And seeing no ambiguity, the majority (correctly) disregards the extrinsic evidence, such as the County's issuing of bonds to fund its retiree healthcare obligation and the many statements by County officials and representatives that support the plaintiffs' contention that the County's promise to provide retiree healthcare benefits extends far beyond 2010.
I agree with the majority's understanding of recent federal jurisprudence governing agreements between employers and their retired employees about healthcare benefits. See M&G Polymers USA, LLC v. Tackett , 574 U.S. 427, 135 S.Ct. 926, 933, 190 L.Ed. 2d 809 (2015) ; CNH Indus. N.V. v. Reese , 583 U.S. ----, 138 S.Ct. 761, 766, 200 L.Ed. 2d 1 (2018). I also agree that this jurisprudence brings the United States Court of Appeals for the Sixth Circuit in line with the principles which govern this Court's contract interpretation.
**332 But I am not convinced that any of those principles compel the result reached by the majority. The question is whether these CBAs are ambiguous. The Tackett Court did not address whether there was ambiguity in the parties' CBA; instead, the Court rejected the Sixth Circuit's unique approach to this particular contractual question and remanded the case for the Court "to apply ordinary principles of contract law in the first instance." Tackett , 574 U.S. at ----, 135 S.Ct. at 937. And while the Reese Court held that the particular agreement was unambiguous and did not provide for lifetime benefits, that CBA differed from those here in one important respect that mattered to the Court's analysis: it included language that specifically tied the promise of retiree healthcare to the agreement's general durational clause. Reese , 583 U.S. at ----, 138 S.Ct. at 766 (explaining that the CBA provided that "the health benefits plan 'ran concurrently' with the collective-bargaining agreement, tying the health care benefits to the duration of the rest of the agreement") (citation and brackets omitted).
CBAs must be interpreted "according to ordinary principles of contract law ...." Tackett , 574 U.S. at ----, 135 S.Ct. at 933 ; see also Port Huron Ed. Ass'n v. Port Huron Area Sch. Dist. , 452 Mich. 309, 327, 550 N.W.2d 228 (1996) ("A collective bargaining agreement, like any other contract, is the product of informed understanding and mutual assent."). The guiding principle is that "as with any other contract, the parties' intentions control." Tackett , 574 U.S. at ----, 135 S.Ct. at 933 (quotation marks and citation omitted); see also McIntosh v. Groomes , 227 Mich. 215, 218, 198 N.W. 954 (1924) ("The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate."). When a contract lacks explicit terms on the duration of retiree **333 benefits, "implied terms" or "industry practice" may show the parties intended those benefits to extend beyond the contract's general durational period. Tackett , 574 U.S. at ----, 135 S.Ct. at 937-938 (Ginsburg, J., concurring); see also Reese , 583 U.S. at ----, 138 S.Ct. at 765 (noting that "[t]he Sixth Circuit did not point to any explicit terms, implied terms, or industry practice suggesting that the 1998 agreement vested health care benefits for life") (citation omitted); Tackett v. M&G Polymers USA, LLC , 811 F.3d 204, 209 (C.A. 6, 2016) ("Thus, while the Supreme Court's decision prevents us from *624 presuming that 'absent specific durational language referring to retiree benefits themselves, a general durational clause says nothing about the vesting of retiree benefits,' we also cannot presume that the absence of such specific language, by itself, evidences an intent not to vest benefits or that a general durational clause says everything about the intent to vest.") (citation omitted); Morley v. Auto. Club of Mich. , 458 Mich. 459, 466, 581 N.W.2d 237 (1998) ("[W]hat is plainly implied from the language used in a written instrument is as much a part thereof as if it was expressed therein.") (quotation marks and citation omitted). For example, ambiguity can arise "where a CBA links eligibility for a particular right 'to an event that would almost certainly occur after the expiration of the agreement' ... [because] such linkage 'signals the parties' intent to continue retirement health benefits notwithstanding expiration.' " Alday v. Raytheon Co. , 693 F.3d 772, 785 (C.A. 9, 2012) (brackets omitted), quoting Quesenberry v. Volvo Trucks North America Retiree Healthcare Benefit Plan , 651 F.3d 437, 441 (C.A. 4, 2011).
All of that is to say that a court should not engage in presumptions that favor either the plaintiffs or the County. But the implied terms make this a hard case.
**334 Unlike in the CBA at issue in Reese , these CBAs did not tie retirement healthcare benefits to the general durational clause. And specific clauses in these CBAs governing eligibility for retirement healthcare imply that the County and the unions intended that healthcare benefits specific to retirees would last for those retirees' entire retirements.
General principles of contract law lead me to conclude that these contracts are ambiguous, because they are equally susceptible to more than one meaning. Barton-Spencer v. Farm Bureau Life Ins. Co. of Mich. , 500 Mich. 32, 40, 892 N.W.2d 794 (2017) ; see also Hall v. Equitable Life Assurance Society of the United States , 295 Mich. 404, 409, 295 N.W. 204 (1940) (" 'A patent ambiguity is one apparent upon the face of the instrument, arising by reason of inconsistency, obscurity or an inherent uncertainty of the language adopted, such that the effect of the words in the connection used is either to convey no definite meaning or a double one.' "), quoting Zilwaukee Twp. v. Saginaw Bay City R. Co. , 213 Mich. 61, 69, 181 N.W. 37 (1921).[3] And because these CBAs are equally susceptible to being read as promising retirement healthcare for retirement, I believe a jury should resolve this question.
In my view, the general durational clause is doing more work for the majority than it should. These CBAs contain no provision that connects the promise of retiree healthcare benefits to the duration of any CBA. Cf. Reese , 583 U.S. at ----, 138 S.Ct. at 766 (explaining that the CBA at issue provided that "the health benefits plan 'ran concurrently' with the **335 collective-bargaining agreement, tying the health care benefits to the duration of the rest of the agreement") (citation and brackets omitted); Cherry v. Auburn Gear, Inc. , 441 F.3d 476, 482-483 (C.A. 7, 2006) (concluding that there was no ambiguity because the CBA provided that the employer's obligation to provide benefits continued " 'during the period of this agreement' "); Barton v. Constellium Rolled Prod.-Ravenswood, LLC , 851 F.3d 349, 352-354 (C.A. 4, 2017) (finding that there was no ambiguity *625 because the CBA provided that retiree health benefits " 'shall remain in effect for the term of this ... Labor Agreement' "); Crown Cork & Seal Co., Inc. v. Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO , 501 F.3d 912, 917-918 (C.A. 8, 2007) (finding that there was no ambiguity because the CBAs provided that the employer would continue to provide benefits " 'without modification for the life of' " the CBAs).
But the CBAs in this case contain provisions that imply the opposite conclusion. The CBAs' survivor clause, the supplemental-care clause, and the subsequent-employment clause each imply that retirement healthcare is a benefit that generally runs with retirement for life. In my view, these more specific provisions, the nature of the benefit, and the lack of a provision tying the benefits to the general durational clause (unlike in Reese ) creates ambiguity.
Yes, a retiree can die, become Medicare-eligible, or become re-employed within any given three-year term of a CBA. And, therefore, I agree with the majority that these provisions do not irreconcilably conflict with the three-year durational clause. But an irreconcilable conflict is not the only way a contract can be ambiguous. As this Court stated in Hall , 295 Mich. at 409, 295 N.W. 204, a contract may be ambiguous "by reason of inconsistency, **336 obscurity or an inherent uncertainty of the language adopted, such that the effect of the words in the connection used is either to convey no definite meaning or a double one." (Quotation marks and citation omitted.) See also Reese , 583 U.S. at ----, 138 S.Ct. at 765 (explaining that a CBA is ambiguous if it is "reasonably susceptible to at least two reasonable but conflicting meanings") (citation and quotation marks omitted).
Each of these provisions supports a reading that the CBAs promise retiree healthcare benefits for retirement (that is, for life) for those employees who become eligible for them during the term of the contract. For example, the survivor clause says that healthcare benefits for an eligible spouse "will terminate upon the death of the retiree unless the retiree elects to exercise a retirement option, whereby the eligible current spouse receives applicable retirement benefits following the death of the retiree." (Emphasis added.) This promise continues spousal coverage until the death of the retiree , and even beyond that for an indefinite period, if the retiree makes a spousal election. That is, even if the retiree-spouse dies before the CBA expires, the contractual language implies that the spousal benefits continue beyond any three-year term.
The supplemental-care clause and the subsequent-employment clause similarly support plaintiffs' reading of the CBAs. While it is possible for the triggering events to happen within the three-year term of a CBA, that durational limitation isn't the most commonsense reading of the language. The context is retirement , after all-that portion of life following work and extending to death. The parties to the CBAs might have intended the natural reading of the supplemental-care clause: that it offers supplemental coverage once a retiree becomes eligible for Medicare, which, for many employees who **337 retire during a CBA, will be some time beyond that three-year period. See Consol. Rail Corp. v. R. Labor Executives' Ass'n , 491 U.S. 299, 311, 109 S.Ct. 2477, 105 L.Ed. 2d 250 (1989) (stating that practice, usage, and American custom must be considered when interpreting a CBA); United Steelworkers of America v. American Mfg. Co. , 363 U.S. 564, 567, 80 S.Ct. 1343, 4 L.Ed. 2d 1403 (1960) ("[S]pecial heed should be given to the context in which collective bargaining agreements are negotiated and the *626 purpose which they are intended to serve."). It is at least equally reasonable to conclude that, by "link[ing] eligibility for a particular right 'to an event that would almost certainly occur after the expiration of the agreement'-e.g., turning 65 or becoming eligible for Medicare-such linkage 'signals the parties' intent to continue retirement health benefits notwithstanding expiration.' " Alday , 693 F.3d at 785, quoting Quesenberry , 651 F.3d at 441 (brackets omitted).
Understanding the retiree healthcare benefits to apply to retirement for those employees who enter that status during the term of the CBA is at least equally reasonable given the context. In my view, the majority's conclusion that the parties must have intended the opposite result-that the general durational clause limits retirement healthcare benefits to three years (or less, depending on when an employee retires)-doesn't account for the CBAs' implied terms, which differentiate these contracts from those at issue in Reese .
If these retiree healthcare benefits are guaranteed for no more than three years, then for any single retiring employee the length of the retirement benefit will depend solely on when that employee retires within the three-year period of the CBA. That is, the majority interprets the agreement as giving benefits **338 for only a short time to any employee who retires near the end of a term, whereas an employee who retires near the beginning of the same CBA would be entitled to nearly three years of those very same benefits. It is an odd reading that results in the value of the retirement benefit varying with the arbitrary date of the employee's retirement, rather than years of service or any other factor.
Finally, I respectfully disagree with the majority that my approach to these CBAs is the same approach that the Supreme Court of the United States implicitly rejected in Tackett and Reese . Neither Tackett nor Reese -nor our own jurisprudence-compels the result the majority reaches.[4] Tackett and Reese left open the possibility that a CBA's promise of retiree healthcare might be ambiguous notwithstanding the presence of a general durational clause. Nor did either case condition a finding of ambiguity on whether the agreement contained language expressly disclaiming application of the general durational clause to the promise of retiree healthcare. I assume the Supreme Court left these possibilities open for a reason: there are cases in which, despite a general durational clause, the contractual language is equally susceptible to more than one meaning. I am not convinced that the majority's decision leaves open that possibility of ambiguity;
**339 under its framework, it is difficult to imagine under what circumstances a general durational clause will not control.[5] While it is true that the parties *627 could have included express language in the CBAs providing a different duration for retiree healthcare, that is simply another way of saying that the parties could have written an unambiguous contract.
Given the patent ambiguity, I would reverse that part of the Court of Appeals' judgment remanding the case to the trial court for entry of summary disposition in favor of the plaintiffs, because the meaning of an ambiguous contract is a question that generally must be decided by the trier of fact. Klapp v. United Ins. Group Agency, Inc. , 468 Mich. 459, 469, 663 N.W.2d 447 (2003) ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury.").
III. RELIEF
The plaintiffs have identified extrinsic evidence that they believe suggests that the County promised retiree healthcare for retirement. The County's actuaries issued regular reports, beginning as early as 1993, describing the benefits as an "IOU" (I owe you)
**340 to the County's future retirees. The County created a trust specifically for retiree healthcare, which it funded with tens of millions of dollars to satisfy its future obligations. The County issued bonds to fund that trust when it determined that current funding levels would not be enough to meet its future obligations "for the next 50 years." During labor negotiations, the County's representatives described the retiree healthcare as a "lifetime" benefit. Many retirees tell the same story: that representatives from the County assured them that their healthcare benefits would last their lifetimes. And the County's bargaining history might support the plaintiffs' view: while its position here is that retirement healthcare is only promised for the three years of each CBA, the County has continuously provided it to retirees in every CBA since 1986.[6]
*628 **341 But the County has an explanation for all this evidence: it intends to continue providing such benefits to its retirees, even if it is not contractually obligated to do so. And the County's historical practice of renegotiating retiree healthcare and applying the new terms to past retirees might be evidence that supports its position.
The contracting parties' intent is a disputed question of fact; I believe the Court of Appeals and trial court both erred by determining that, on this record, summary disposition was appropriate. See Klapp , 468 Mich. at 469, 663 N.W.2d 447. I would remand to the trial court for further proceedings.
IV. CONCLUSION
I disagree with the majority's conclusion that these CBAs unambiguously limit retiree healthcare to the CBAs' general three-year durational clause. It is just as likely that the parties to these CBAs intended the promised retirement benefits to apply to an employees' entire retirement. I would conclude that there is ambiguity about the parties' intent, and I would let the fact-finder resolve it with the benefit of the extrinsic evidence from both sides.
I respectfully dissent.
Bernstein, J., concurred with McCormack, C.J.
**342 Cavanagh, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

The County entered into a different CBA with each bargaining unit, but the parties agree that the relevant language in each CBA is "materially similar."

The first round of CBAs expired on December 31, 1989.

I agree with the majority that the ambiguity identified by the Court of Appeals is a patent ambiguity, not a latent ambiguity. See Shay v. Aldrich , 487 Mich. 648, 667-668, 790 N.W.2d 629 (2010). Because I see patent ambiguity on the face of the CBAs, I don't address latent ambiguity.

The majority concludes that an important difference between these CBAs and the agreement in Reese -the existence of language explicitly linking the providing of retiree healthcare benefits to the CBA's durational clause-was not "dispositive" to the Reese Court's analysis. Maybe not-the opinion doesn't say either way. But it was one of several provisions that the Court cited in concluding that the CBA was not ambiguous, none of which the Court proclaimed to be dispositive alone. See Reese , 583 U.S. at ----, 138 S.Ct. at 766. And the CBAs in this case do not include any similar language explicitly linking retiree healthcare benefits to the durational clause. That makes these CBAs different, and importantly so.

The majority acknowledges that ambiguity might be found (notwithstanding a general durational clause) if the CBA "tied benefits to an event that could only occur or would almost certainly not occur until after the expiration of the CBA[.]" Again, I acknowledge that there is no irreconcilable conflict here; events triggering the CBAs' survivor clause, supplemental-care clause, or subsequent-employment clause could occur before expiration of the CBA. But unlike the majority, I don't believe it is only "conceivabl [e ]" that these triggering events would occur beyond the expiration of the CBA. These CBAs permit an employee to retire at age 50 and receive both a pension and retiree healthcare benefits. For most employees who retire during a CBA's three-year-term, the triggering events (death or reaching age 65) are almost certain to occur beyond the expiration of that term.

The County says that every time it negotiated a CBA, both it and the union understood that the unions only represented the interests of active employees, not retirees. See Defendant's Supplemental Brief, p 16 (stating that "[t]he CBAs since 1986 have been negotiated with the County of Macomb by 23 Unions on behalf 'of regular employees,' generally effective every three years."). This approach is consistent with federal labor law, under which a union does not have to bargain on behalf of retired employees because they are no longer members of the bargaining unit. See Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co. , 404 U.S. 157, 180, 92 S.Ct. 383, 30 L.Ed. 2d 341 (1971) (concluding that the future retirement benefits of active workers were subject to mandatory bargaining because those benefits were part of their overall compensation). The Court of Appeals has held the same. See West Ottawa Ed. Ass'n v. West Ottawa Pub. Sch. Bd. of Ed. , 126 Mich. App. 306, 328-330, 337 N.W.2d 533 (1983).
This leads to an interesting question relating to the County's bargaining history with these unions. If the unions did not have to bargain on behalf of retired employees and the County did not have to continue providing healthcare to them, what are we to make of the fact that the parties continued to negotiate about the terms of retiree healthcare in successive CBAs and that those changes were applied to employees who retired under earlier agreements? On the one hand, the consistent practice of agreeing to new terms for retiree healthcare and applying those new terms to all retired employees (not just those who retired under the current agreement) might suggest that the parties did not believe the benefits lasted beyond the term of the contract. On the other hand, the continued coverage since 1989, even if the County did not have to provide healthcare for the already-retired employees, might be evidence that the County and the unions all believed that retiree healthcare was promised for retirement.